The LANDS COUNCIL, Idaho Sporting Congress, Inc., the Ecology Center, and the Kootenai Environmental Alliance, Plaintiffs,

v.

Robert VAUGHT and/or Rolando Ortegon, in his official capacity as Forest Supervisor of the Colville National Forest; David Wright, in his official capacity as Forest Supervisor of the Idaho Panhandle National Forests; and Mike Dombeck, Chief of the U.S. Forest Service, and agency of the U.S. Dept. of Agriculture, Defendants,

v.

Intermountain Forest Association; Idaho Forest Owners Association; and Vaagen Brothers Lumber, Inc., Defendant–Intervenors.

No. CS–00–0185–EFS.

United States District Court, E.D. Washington.

March 29, 2002.

Terrence V Sawyer, Spokane, WA, D Bernard Zaleha, Wild Fund Inc, Thomas J Woodbury, Attorney at Law, Boise, ID, for plaintiffs.

William Herbert Beatty, U S Attorney's Office, Spokane, WA, Robert A Maynard, Perkins Coie LLP, Boise, ID, for defendants.

## ORDER GRANTING IN PART AND DENYING IN PART CROSS MOTIONS FOR SUMMARY JUDGMENT, AND GRANTING PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION

SHEA, District Judge.

On March 9, 2001, the Court heard oral argument on the summary judgment motion filed by Plaintiffs, (Ct.Rec.103), and by Defendants Robert Vaught, David Wright and Mike Dombeck ("the Federal Defendants"), (Ct.Rec.109). Defendants Intermountain Forest Association, Idaho Forest Owners Association, and Vaagen Brothers Lumber, Inc. ("the Intervenor Defendants") have joined the Federal Defendants' summary judgment motion. (Ct. Rec.115.)

At the hearing, Plaintiffs were represented by Tom Woodbury and Terrence Sawyer. Alan Campbell represented the Federal Defendants. The Intervenor Defendants were represented telephonically by Robert A. Maynard. The Court has reviewed the motions, the file and those

parts of the administrative record cited by
the parties.

| | | |
|---|---|---|
| I. | OUTLINE OF DECISION | 1218 |
| II. | BACKGROUND | 1219 |
| III. | CROSS MOTIONS FOR SUMMARY JUDGMENT | 1220 |
| | A. Summary Judgment Standard | 1221 |
| | B. Old Growth Habitat, Old Growth Species and Sensitive Species | 1221 |
| | 1. NEPA Requirements for Meaningful Old Growth Data | 1221 |
| | a. CNF Old Growth Data | 1222 |
| | b. IPNF Old Growth Data | 1222 |
| | 2. NFMA Requirement for Consistency with LRMP Old Growth Standards | 1223 |
| | 3. NFMA Requirement to Maintain Old Growth Species Viability | 1225 |
| | 4. LRMP Requirement to Monitor Species Populations | 1225 |
| | 5. NFMA Requirement for Consistency with LRMP Habitat Distribution Standards | 1227 |
| | C. Water Quality | 1229 |
| | 1. CWA Requirements and the Idaho Portion of the Project | 1229 |
| | a. Violation of the CWA | 1229 |
| | i. Addition of Sediment Load to Degraded Streams | 1229 |
| | ii. Reliance on State–Approved BMPs | 1230 |
| | b. Violation of the Arbitrary and Capricious Standard | 1231 |
| | 2. NFMA Requirement for Consistency with the IPNF LRMP Water Quality Monitoring Program | 1232 |
| | 3. LRMP Requirement to Conduct BMP Effectiveness and Validation Monitoring | 1232 |
| | 4. LRMP Requirement Regarding WATSED Model Calibration | 1233 |
| | 5. NEPA Requirements | 1234 |
| | a. Assumption Regarding Dead and Dying Trees | 1234 |
| | b. WATSED's Validated/Recalibrated Status and the IPNF LRMP Standard | 1238 |
| | c. Disclosure of WATSED's Failure to Evaluate In–Channel and Stream–Bank Erosion and Effect of Rain–on–Snow and Large Destructive Events | 1238 |
| | d. Use of WATSED to Predict Sediment and Water Yield Increases | 1239 |
| | e. Disclosure of Water and Sediment Yield for Project's First Six Years | 1240 |
| | f. Disclosure of Impacts from Rain–on–Snow Discharge Events and from Instream Sediment Discharges | 1241 |
| | i. Rain–on–Snow Sediment/Water Discharge Events | 1242 |
| | ii. Instream and Streambank Sediment Discharges | 1243 |
| | D. Fisheries | 1244 |
| | E. Cumulative Impact Analysis under NEPA | 1245 |
| | 1. Effects of Old Growth Harvest on Old Growth Species | 1245 |
| | 2. Effects on CNF from Timber Harvest on Adjacent Lands | 1246 |
| | a. Cataloging of Past Timber Harvest Activities | 1246 |
| | b. Consideration of Adjacent Land Timber Harvest Activities | 1246 |
| | 3. Effects on IPNF from Logging | 1248 |
| | a. Coeur d'Alene Ranger District | 1248 |
| | b. Priest Lake Ranger District | 1249 |
| | i. Lakeface–Lamb Project EIS | 1249 |
| | ii. Stimson Timber Sale | 1250 |
| | iii. Analysis of Future Projects | 1250 |
| | 4. Effects of Water Yield and Sediment Discharge | 1250 |
| | 5. Effects of Grazing in the IPNF Project Area | 1251 |
| | 6. Effects of Off Road Vehicles | 1251 |
| | F. Summary | 1252 |

IV. PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION ................1254

## II. BACKGROUND

In late 1998 and early 1999, the United States Forest Service ("Forest Service") began addressing a Douglas-fir bark beetle outbreak and various ecosystem imbalances in the Colville and Idaho Panhandle National Forests ("CNF" and "IPNF," respectively). Pursuant to the National Environmental Policy Act ("NEPA"), the Forest Service prepared an environmental impact statement identifying various alternatives for addressing the outbreak and imbalances. The final form of this statement, known as the Final Environmental Impact Statement ("FEIS"), was released to the public on June 14, 1999. On June 11, 1999, the Forest Service issued two records of decision ("RODs") that adopted, with modifications, several of the alternatives identified in the FEIS.

The alternatives adopted by the RODs are known as the Douglas Fir Bark Beetle Project ("the Project"). The Project is to respond to the bark beetle outbreak, restore vegetation, restore aquatic ecosystems, and reduce forest fire fuels—largely by logging 145 million board-feet of trees. Project restoration work is to be implemented either as part of timber sale contracts or with funds generated by those sales. Overall, Project work is expected to affect more than 19,000 acres of forested land in the IPNF and 4,300 acres of forested land in the CNF.

Pursuant to 36 C.F.R. §§ 215.9 and 215.13, The Lands Council, Ecology Center, Idaho Conservation League, and Kootenai Environmental Alliance ("the Montana plaintiffs") administratively appealed the Forest Service's decisions to adopt and implement the Project. The appeals were denied in September 1999.

On February 1, 2000, the Kettle Range Conservation Group and Leavenworth Audubon, Adopt–A–Forest ("the Kettle Range plaintiffs") filed suit in this district challenging the implementation of the CNF portion of the Project on NEPA and NFMA grounds. The judge in that case found that the Kettle Range plaintiffs lacked standing and dismissed the case on July 12, 2000, for lack of subject matter jurisdiction. The Kettle Range plaintiffs filed an appeal on September 8, 2000. The Ninth Circuit reversed and remanded, concluding that the district court should have considered the additional documents filed by the Kettle Range plaintiffs to support standing. On July 10, 2001, the judge in that case granted the Kettle Range plaintiffs' motion for summary judgment and enjoined the CNF portion of the Project.

Plaintiffs filed the instant suit on May 25, 2000, asserting that the Federal Defendants, in approving and proceeding with the Project, violated the Administrative Procedures Act ("APA"), NEPA, NFMA, the Clean Water Act ("CWA"), and the regulations implementing these acts. (Compl., Ct.Rec.1.) At the same time, Plaintiffs filed their First Injunction Motion. The Court denied the motion by letter ruling on July 25, 2000. On October 23, 2000, Plaintiffs filed a Second Injunction Motion consisting of a motion to reconsider the letter ruling and a renewed motion for temporary restraining order and preliminary injunction. The Court denied the second motion and set forth its rationale for both rulings in its December 6, 2000, Order Denying Plaintiffs' Motion and Renewed Motion for Temporary Restraining Order and Preliminary Injunction, (Ct.Rec.92). Plaintiffs appealed. On February 23, 2001, the Ninth Circuit enjoined the entire Project pending the disposition of the preliminary injunction appeal. (Ct.Rec.150.) On August 8, 2001, the Ninth Circuit issued a second modifica-

tion of the injunction it had issued in February of 2001 "to permit the removal of timber in both the Colville National Forest and the Idaho Panhandle National Forest that had been cut before the injunction was issued, but has not been skidded or yarded." (Ct.Rec.179.) That was received in this Court on August 13, 2001. On August 24, 2001, the Ninth Circuit issued an Order denying the motion of the appellants of expedited relief from what they characterized as violations of the second modification of the February Order granting preliminary injunction pending the final disposition of Plaintiffs' appeal of this Court's denial of a preliminary injunction. That Ninth Circuit Order was filed in this Court on August 31, 2001. (Ct.Rec.180.) In it the Ninth Circuit referred the question of whether or not its order had been violated to this Court as in a better position to determine if a violation had occurred. (Ct. Rec. 180 at p.3.) It also said, "Land Council's emergency motion is DENIED without prejudice to renewal in the district court." (Ct. Rec. 180 at p.3.) However, no such emergency motion was ever filed in this Court which would have been the proper vehicle to determine if a violation had occurred. Hence, this Court has made no such determination. On October 16, 2001, the August 14, 2001 decision of the Ninth Circuit on the merits of the appeal of this Court's denial of a preliminary injunction was filed in this Court. (Ct.Rec.181.) It reversed this Court's decision denying the preliminary injunction and remanded it to this Court to determine the "appropriateness of preliminary injunctive relief without relying on that clearly erroneous finding of fact." (Ct. Rec. 181 p. 5.) The Ninth Circuit extended its injunction pending appeal until this Court rules on the matter or makes a final decision in the case on the merits. (Ct. Rec.6.)

On April 23, 2001, Plaintiffs filed their First Amended Complaint, (Ct.Rec.174), having received leave from the Court to do so, (Ct.Rec.168). The First Amended Complaint is identical to the original complaint except numerous statements of fact and four new claims are added. As in the original complaint, Plaintiffs seek 1) a declaration that approving and proceeding with the Project is arbitrary and capricious and violates the APA, NEPA, NFMA and CWA, and of their implementing regulations, and 2) a permanent injunction barring the Federal Defendants from proceeding with the Project until the Federal Defendants have adequately complied with all applicable laws. (Ct. Rec. 174 at 2 ¶ 1.3.)

## III. CROSS MOTIONS FOR SUMMARY JUDGMENT

On January 19, 2001, Plaintiffs and the Federal Defendants filed the instant cross motions for summary judgment. They each assert that there is no dispute regarding any material fact and that they are entitled to judgment as a matter of law. Plaintiffs also seek a permanent injunction.

Plaintiffs raise fourteen claims in their First Amended Complaint, (Ct.Rec.174). Because the parties' motions are for full, rather than partial, summary judgment, and because the Federal Defendants address each of Plaintiffs' fourteen claims, the Court deems this suit to comprise only those issues raised in the parties' summary judgment memoranda and, pursuant to the Plaintiffs' request, in the Plaintiffs' two preliminary injunction motions. (Pls.' Mem. Supp. Mot. Summ. J. & Permanent Inj., Ct. Rec. 104, at 2 ll. 5–7.) The claims and issues have been grouped according to subject matter and are addressed accordingly hereinafter.[1]

---

1. The Court deems abandoned, and does not consider, those claims that Plaintiffs asserted only in their First Amended Complaint and did not argue in their summary judgment

## A. Summary Judgment Standard

■ In asserting that the Federal Defendants' decision to approve and proceed with the Project is arbitrary and capricious and violates the APA, NEPA, NFMA, CWA and their implementing regulations, Plaintiffs essentially ask the Court to review the Federal Defendants' decision pursuant to the APA, 5 U.S.C. § 706. *See Dredge Corp. v. Penny,* 338 F.2d 456, 462 (9th Cir.1964) (holding that because the complaint's claims were based on the alleged invalidity of certain administrative decisions, the court proceeding was essentially one to review those decisions pursuant to 5 U.S.C. § 1009(e) [now § 706] ). A reviewing court shall set aside agency actions, findings and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (West 1996). Because an agency's action is presumed to be valid, the challenging party bears the burden of proving that the action violates § 706(2)(A). *See Preston v. Heckler,* 734 F.2d 1359, 1372 (9th Cir.1984); *Varicon Int'l. v. Office of Pers. Mgmt.,* 934 F.Supp. 440, 444 (D.D.C.1996); *Natural Res. Def. Council v. United States Envtl. Prot. Agency,* 806 F.Supp. 1263, 1272 (E.D.Va. 1992).

■ A court shall enter summary judgment in favor of a moving party if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A district court reviewing an agency decision pursuant to § 706 is not required to resolve any facts; rather, the court "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. Immigration & Naturalization Serv.,* 753 F.2d 766, 769 (9th

Cir.1985); *see also Northwest Motorcycle Ass'n v. United States Dep't of Agric.,* 18 F.3d 1468, 1472 (9th Cir.1994). Accordingly, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency [based on the record before it at the time] could reasonably have found the facts [and reached the decision] that it did." *Occidental,* 753 F.2d at 770; *see also Northwest Motorcycle,* 18 F.3d at 1472. Therefore, in deciding the parties' summary judgment motions, the Court applies the legal standards governing a review conducted pursuant to § 706(2)(A) and determines whether, as a matter of law, the Federal Defendants' decision to approve and proceed with the Project is arbitrary and capricious or violates the APA, NEPA, NFMA, CWA and their implementing regulations. *See, e.g., Oregon Natural Res. Council v. Lowe,* 109 F.3d 521, 526 (9th Cir.1997) (applying, in a review of the district court's summary judgment rulings regarding Forest Service's actions, the "arbitrary and capricious" standard to a NFMA challenge and the "hard look" standard to a NEPA challenge).

## B. Old Growth Habitat, Old Growth Species and Sensitive Species

Plaintiffs assert that the Federal Defendants violated the APA, NEPA and NFMA with respect to old growth habitat, old growth species and sensitive species.

### 1. NEPA Requirements for Meaningful Old Growth Data

■ Plaintiffs claim that the FEIS does not present, and the Federal Defendants did not rely on, high quality old growth forest data, with the result that the Federal Defendants' decision violates NEPA and is arbitrary and capricious. Specifically, Plaintiffs assert with respect to the CNF

motion or in their response to the Federal Defendants' summary judgment motion.

that (1) the FEIS fails to provide information on the amount of old growth, (2) there is no old growth field-verified inventory, and (3) the FEIS fails to set forth the old growth standard from the CNF Land and Resource Management Plan ("LRMP"). With respect to the IPNF, Plaintiffs claim that (1) the old growth data that the FEIS draws from the timber stand management reporting system ("TSMRS") database is at least 15 years old, inaccurate, and incomplete, and (2) the FEIS should have disclosed such deficiencies.

#### a. CNF Old Growth Data

Old growth forests

encompass the later stages of stand development that typically differ from earlier stages in characteristics such as tree age, tree size, number of large trees per acre and basal area. Attributes such as decadence, dead trees, the number of canopy layers and canopy gaps are also important but are more difficult to describe because of high variability.

(Fed. Defs.' Opp'n Pls.' Mot. Prelim. Inj., Ct. Rec. 7, FEIS & ROD, Ex. 1, FEIS Acronyms and Glossary "Old-growth Forest" at AG–11—AG–12.) Within the CNF, Structural Stage 6, a multi-stratum stage with at least eight large trees per acre, and Structural Stage 7, a single storied stage with at least eight large trees per acre, are considered "late and old structure" ("LOS"), (Ct. Rec. 7 Ex. 1 FEIS at III–675, AG–18—AG–19). Together, these stages apparently encompass, but are not composed solely of, the CNF's old growth. (Ct. Rec. 7 Ex. 1 FEIS at III–665, III–681.) The FEIS sets forth the acreage for each structural stage in the CNF Project Analysis area. (Ct. Rec. 7 Ex. 1 FEIS at III–680.) It does not set forth CNF old growth acreage information, old growth inventory data, or the old growth standard from the CNF LRMP. However, readers are referred to the "project files," (Ct. Rec. 7 Ex. 1 FEIS at I–2), where field

reconnaissance survey forms identify the units considered in the FEIS that contain old growth, (Ct. Rec. 7, Elec. Project File, Ex. 2, Newport Ranger District, Project Files CD ROM # 4, Vegetation Douglas Fir Beetle Surveys subdirectories, N_VE_1–31).

The FEIS's failure to provide information on the amount of old growth, to provide old growth field-verified inventory and to set forth the CNF's LRMP old growth standard does not prevent the FEIS from having presented, nor the Federal Defendants from having relied on, high quality old growth forest data that is required by 40 C.F.R. § 1500.1(b). *See Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146, 1150 (9th Cir.1998). The field reconnaissance survey forms provide sufficient hard data to support the FEIS statement that "[a]ll units were evaluated for potential old growth characteristics. No alternatives propose treatment in any old growth stands, therefore old growth abundance would be unaffected by any action alternative." (Ct. Rec. 7 Ex. 1 FEIS at III–676.) Accordingly, in this regard, the Federal Defendants' decision does not violate NEPA and is not arbitrary and capricious. The Federal Defendants' motion for summary judgment on this issue is GRANTED; Plaintiffs' motion is DENIED.

#### b. IPNF Old Growth Data

Information on forest structural stages in the IPNF Project areas is based on the TSMRS database, a database developed from stand exam information, historical records and aerial photo interpretation. (Ct. Rec. 7 Ex. 1 FEIS at III–14, III–375.) The FEIS references the "project files," (Ct. Rec. 7 Ex. 1 FEIS at I–2), which contain old growth field survey notes for the units considered by Project alternatives, (Ct. Rec. 7 Ex. 2, Priest Lake Ranger District, Project Files CD ROM # 2,

Vegetation, Old_Growth subdirectories, P_VE_1–110; Ct. Rec. 7 Ex. 2, Coeur d'Alene River Ranger District, Project Files CD ROM # 1, Vegetation, Oldgrowth and Field_Notes subdirectories, VE_1–18).[2] Most of the surveys were conducted in November 1998.

Plaintiffs' claim that the TSMRS database is at least 15 years old and has been found, on field review, to overstate old growth by 32–56%. (Decl. Jeff Juel, Ct. Rec. 105, at 9 ¶¶ 27–29, 10 ¶¶ 30–31.) However, as the administrative record demonstrates, much if not most of the old growth data regarding the IPNF Project area was in fact updated in November 1998 or during the preceding and following months. This updated information provides the hard data supporting the FEIS statements that "no harvest within old growth is proposed in the Coeur d'Alene [Project area]" and that dead douglas-fir and understory trees will be harvested from dry site old growth ponderosa pine stands in the Priest Lake Project Area. (Ct. Rec. 7 Ex. 1 FEIS at III–829.) Accordingly, the FEIS presented, and the Federal Defendants relied on, high quality old growth forest data. There were no data deficiencies regarding actual old growth forest data which require disclosure. With respect to these issues, the Federal Defendants' decision does not violate NEPA and is not arbitrary and capricious. Accordingly, the Federal Defendants' summary judgment motion is GRANTED with respect to this issue; Plaintiffs' motion is DENIED.

**2. NFMA Requirement for Consistency with LRMP Old Growth Standards**

 NFMA requires the preparation of LRMPs, or forest plans, for each administrative unit of the National Forest System. *See* 16 U.S.C. § 1604(a); 36 C.F.R.

219.4(b)(3) (1999). Site-specific decisions, such as ones to sell timber, "must be consistent with the LRMP for the larger area." *Neighbors of Cuddy Mountain v. United States Forest Serv.,* 137 F.3d 1372, 1376–77 (9th Cir.1998); 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e) (1999). The Forest Service must demonstrate that site-specific projects are consistent with the forest's LRMP. The CNF LRMP provides that old growth dependent species habitat, consisting of 30,741 acres, will be managed for preservation. (Decl. Constance J. Smith, Ct. Rec. 120, CNF LRMP, Ex. U, at 4–67—4–72.) The IPNF LRMP requires maintenance of at least 10% of the forested portion of the IPNF as old growth. (Second Decl. David J. Wright, Ct. Rec. 97, Additional Project R. Docs., CD–ROM Disk 10, IPNF LRMP, Other*IPNF_1987_Forest_Plan.pdf, at II–29.) It also sets standards for old growth acreage in several management areas. (Ct. Rec. 97 CD–ROM Disk 10 Other*IPNF_1987_Forest_Plan.pdf chap. III.)

The Federal Defendants assert that they need not demonstrate compliance with the LRMP old growth standards because no old growth will be harvested as part of the Project. (Ct. Rec. 7 at 14 lines 17–19.) The sole entry into old growth habitat in the entire Project area will occur in the IPNF's Priest Lake Ranger District where dead douglas fir will be removed to protect dry site ponderosa pine old growth. (Ct. Rec. 7 at 14 lines 25–27, at 15 lines 1–7.) Plaintiffs respond that such action constitutes old growth logging.

The parties' disagreement arises from differing definitions of "old growth." As is set forth in the FEIS,

---

**2.** The project files also reportedly contain the TSMRS database, (Ct. Rec. 7. Ex. 2, NEPA Process, Project Files CD Rom # 3, Electron-

ic_Data, ED_2.pdf). However, the Court was unable to access this electronic portion of the file.

Douglas-fir and ponderosa pine old growth in the Priest Lake subbasin historically occurred in very dry to moderately dry habitat types. Very dry sites were dominated by large, old ponderosa pine or Douglas-fir ... Grasses and low shrubs dominated the understory ... Downed woody fuels consisted of widely scattered, large trees, twigs, branches and cones; often the most abundant surface fuel was cured grass. Before the 20th century, these sites were characterized by frequent underburns that eliminated most tree regeneration, thinned young stands, and perpetuated open stands dominated mainly by ponderosa pine.

(Ct. Rec. 7 Ex. 1 FEIS at III–363—III–364.) The Federal Defendants assert that "on dry sites removal of unnatural concentrations of dead, dying, and dense understory Douglas-fir is fully consistent with, and beneficial to, the continuing function of these stands as old growth." (Ct. Rec. 132 at 9 ll. 12–14.)

The Court finds reasonable the old growth definition set forth in the FEIS. The definition provides a rational and ample basis for the Federal Defendants' conclusion that the removal of the dead, dying and dense Douglas-fir understory in the Priest Lake Ranger District's dry site ponderosa pine old growth is not logging of old growth. Accordingly, the Court defers to the Federal Defendants' determination regarding logging of old growth. *See Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) ("when specialists express conflicting views, an agency has discretion to rely on the reasonable opinions of its own qualified experts.")

Plaintiffs claim that even if the Project does not log old growth, compliance with the LRMPs' old growth standards must be demonstrated to ensure that the mature trees logged under the Project are not needed to fill any shortfall in the required old growth acreage. As the FEIS states, "[e]xisting structurally immature stands could provide old-growth habitat over time if not disturbed or if managed to maintain large, old, diseased and dead structural components of the forest within levels needed to provide suitable habitat." (Ct. Rec. 7 Ex. 1 FEIS at III–243.) The Court concurs with Plaintiffs' interpretation of the requirement that projects be consistent with land and resource management plans. Although the Project will not log forest meeting the technical definition of old growth, it will harvest trees. For the Project to be consistent with the CNF and IPNF LRMPs, the tree harvest must be consistent with the LRMP old growth requirements. The Federal Defendants must therefore demonstrate either that adequate old growth acreage exists in the CNF and IPNF to satisfy the LRMP old growth standards or that the timber slated to be harvested under the Project is not needed to fulfill old growth standards.

Neither party cites any data in the record demonstrating that either the CNF or IPNF LRMP old growth standards are being met or that the trees being logged pursuant to the Project are not needed as replacement old growth. The Federal Defendants state that 231,000 of the IPNF's 2,310,000 forested acres must be maintained as old growth, (Fed. Defs.' Revised Mem. Supp. Mot. Summ. J., Ct. Rec. 121, at 33 ll. 25–26), and report that over 300,-000 acres in the IPNF have been allocated or inventoried as old growth, (Ct. Rec. 121 at 34 ll. 1–8.) However, no citation to the administrative record is provided. Additionally, Plaintiffs dispute the accuracy of this old growth data, having noted that the TSMRS database has been found to overstate old growth by 32–56%. (Decl. Jeff Juel, Ct. Rec. 105, at 9 ¶¶ 27–29, 10 ¶¶ 30–31.) Accordingly, the Federal Defendants' decision violates NFMA by failing to dem-

onstrate consistency with the CNF and IPNF old growth standards. Plaintiffs' motion for summary judgment on this issue is GRANTED; the Federal Defendants' motion is DENIED.

### 3. NFMA Requirement to Maintain Old Growth Species Viability

■ Plaintiffs assert that the Project triggers NFMA's requirements with respect to the viability of old growth species because the Project will log old growth and mature forests that soon will become old growth. They allege that these viability requirements have been violated because the Forest Service has failed to maintain adequate old growth habitat and to gather and rely on actual population monitoring data for old growth species.

■ NFMA regulations require forest supervisors to "provide for diversity of plant and animal communities and tree species consistent with the overall multiple-use objectives of the planning area." 36 C.F.R. § 219.26 (1999). Forest supervisors must manage fish and wildlife habitat "to maintain viable populations of existing native and desired non-native vertebrate species." 36 C.F.R. § 219.19 (1999). To insure viable populations are maintained, "habitat must be provided to support, at least, a minimum number of reproductive individuals," *id.*, and population trends of management indicator species ("MIS") must be monitored, *see* 36 C.F.R. § 219.19(a)(6) (1999). Forest supervisors can fulfill NFMA's population monitoring requirement by maintaining sufficient, undisturbed habitat. *See Idaho Sporting Cong.*, 137 F.3d at 1153–54 (citing *Inland Empire Pub. Lands Council v. United States Forest Serv. (Inland Empire United States)*, 88 F.3d 754, 760 (9th Cir.1996)).

Contrary to Plaintiffs' assertion and as has been discussed above, the Project does not log old growth. However, because the record does not demonstrate either (1) that LRMP old growth standards have been met or (2) that undisturbed old growth habitat exists that is capable of supporting a minimum number of reproductive individuals, it is unclear if the Project affects old growth habitat by logging mature forests needed to fulfill old growth shortfall. Accordingly, it is unclear if the Project triggers NFMA's requirements regarding old growth species viability. The summary judgment motions on this issue are DENIED.

### 4. LRMP Requirement to Monitor Species Populations

■ The CNF LRMP provides for annual monitoring of 10% of the MA–1 areas [3] for population and nesting. The IPNF LRMP provides for annual measurement of population trends of indicator species, with reporting to occur every five years. (Ct. Rec. 97 CD–ROM Disk 10 IPNF_1987_Forest_Plan.pdf at IV–11.) Plaintiffs assert that these commitments are intended to comply with the NFMA regulations set forth in 36 C.F.R. §§ 219.10(g), 219.12(d), and 219.19(a)(6), which include the requirement to "obtain and keep current inventory data appropriate for planning and managing [forest] resources." (Pls.' Mem. Supp. Mot. Temp. Restraining Order & Prelim. Inj., Ct. Rec. 4, at 15–16.) Noting that there is no annual population data for the IPNF or CNF and no population trend information for IPNF old growth species, Plaintiffs claim that the Forest Service has violated LRMP population monitoring requirements. (Ct. Rec. 4 at 16 lines 10–15.)

Plaintiffs' complaint, construed within the parameters of this suit, seems to be that the absence of population data (1)

---

**3.** MA–1 or "management area 1" comprises old growth forest that provides essential habitat for old growth dependent species. (Ct. Rec. 120 Ex. U at 4–67—4–72.)

prevents the Federal Defendants from demonstrating that the Project is consistent with the LRMPs, as required by NFMA, and (2) renders the Federal Defendants' decision regarding the Project arbitrary and capricious.[4] Any failure of the Forest Service to monitor the CNF MA–1 areas for species populations is not relevant here. Since the Project will not log, treat or even enter actual CNF old growth, any absence of such population information—the purpose of which is to determine if old growth is being managed to maintain old growth dependent species—does not cause the Federal Defendants' decision to violate NFMA or be arbitrary and capricious.

■ The Federal Defendants' decision regarding the IPNF portion of the Project relies on data from habitat monitoring and habitat analysis, rather than on population trend measurements. Habitat monitoring may be used as a proxy for collecting actual population data even when an LRMP requires population monitoring. *Idaho Sporting Congress*, 137 F.3d at 1154. Deferring to the Forest Service's expertise in interpreting its land management plan, *Idaho Sporting Congress* observed that the plan provided for monitoring habitat quantity and quality and determined that the issue was one of scientific methodology, specifically, how best to track species populations.

The IPNF LRMP specifies no methodology for measuring population trends of indicator species. Rather, it identifies only "State Fish and Game Department" as a "monitoring technique or information source." (Ct. Rec. 97 CD–ROM Disk 10 IPNF_1987_Forest_Plan.pdf at IV–9, IV–

11.) The IPNF Forest Plan Monitoring and Evaluation Report for 1998 (Ct. Rec. 121 Ex. 4), reveals that the Forest Service has done some population monitoring. Noting that "[e]stimating population numbers and trends can be extremely difficult," the Plan states that "[h]abitat information may be used where population data are lacking." (Ct. Rec. 121 Ex. 4 at 23.) Continued monitoring is based on funding and priority. (Ct. Rec. 121 Ex. 4 at 23.) The Court finds that the use of habitat monitoring as a means of monitoring species is consistent with the IPNF LRMP and is not arbitrary and capricious. *Idaho Sporting Congress*, 137 F.3d at 1154.

■ Habitat analysis can be used to demonstrate consistency with NFMA's requirement to manage habitat to maintain viable species populations and to evaluate a project's effect on habitat and population trends. *See Inland Empire United States*, 88 F.3d at 759–63. In *Inland Empire United States*, the Forest Service conducted a habitat analysis that began by relying on studies for the number of acres an individual of each species needs to survive and the percentage of those acres needed for particular purposes, such as nesting, feeding, and denning. *See id.* at 759. The Forest Service concluded that a species will remain viable as long as the threshold percentage of each type of habitat that remained after project completion was greater than the percentage required for the species' survival. *See id.* at 759. The court approved of this method, finding reasonable the Forest Service's assumption that maintenance of the habitat acreage necessary for survival in fact assures the species' survival. *See id.* at 761.

4. In several places in their briefs, Plaintiffs assert that the CNF and IPNF have failed to comply with their LRMPs, thereby violating NFMA. Because this suit concerns the Federal Defendants' decision to approve and proceed with the Project, the Court does not rule on these assertions. Rather, the Court examines only whether the Project is consistent with the LRMPs or whether the absence of data that would have been derived from compliance with the LRMPs renders the Federal Defendants' decision arbitrary and capricious.

The Federal Defendants' IPNF habitat analysis consisted of (1) determining the species or species habitats that would be significantly affected by the Project, (Ct. Rec. 7 Ex. 1 FEIS at III–246—III–248 for the Coeur d'Alene River Ranger District; at III–567—III–568 for the Priest Lake Ranger District), (2) conducting a detailed study of the Project's impacts on the habitats of those species by establishing (a) habitat thresholds, (Ct. Rec. 7 Ex. 1 FEIS at III–278, III–298, III–572, III–574, III–576, III–579), (b) existing habitat conditions, and (c) anticipated habitat changes due to the Project, and (3) determining the amount of habitat that would exist after Project implementation, (Ct. Rec. 7 Ex. 1 FEIS at II–40, II–41, II–46, III–278—III–279, III–280, III–281, III–291, III–300, III–587—III–588, III–591, III–602—III–603, III–611, III–617). This analysis comports with the one endorsed in *Inland Empire United States.*

Because the Forest Service's use of habitat monitoring in lieu of population monitoring is consistent with the IPNF and not arbitrary and capricious, and because the Federal Defendants' habitat analysis mirrors the one approved of in *Inland Empire United States,* the Federal Defendants neither violated NFMA nor were arbitrary and capricious when they relied on habitat monitoring and analysis, rather than population monitoring, in determining whether Project is consistent with the LRMPs and in deciding to proceed with the Project. The Court DENIES Plaintiffs' motion for summary judgment on these issues and GRANTS the Federal Defendants' motion.

**5. NFMA Requirement for Consistency with LRMP Habitat Distribution Standards**

 Plaintiffs assert that the Federal Defendants violate NFMA because even if

the Forest Service monitored habitat in lieu of population trends, they nonetheless fail to demonstrate that the LRMP habitat distribution standards for certain MIS have been met. Plaintiffs specifically cite to the IPNF and CNF LRMP habitat distribution standards for the pileated woodpecker and to the CNF LRMP habitat distribution standards for northern three-toed woodpecker, marten, barred owl and primary cavity excavators.

The Federal Defendants must demonstrate consistency with the LRMP habitat distribution standard for a species only if Project activities will destroy habitat acreage for that species or will destroy potential habitat needed to fill any shortfall in the required habitat acreage.

The pileated woodpecker discussions in the IPNF portion of the FEIS indicate that habitat requirements with respect to snags and old growth structure will not be compromised by the project alternatives. (Ct. Rec. 7 Ex. 1 FEIS at III–258, III–581.) However, it is unclear if the project activities, and hence project consequences, would be the same on land not recognized as pileated woodpecker habitat as on land already meeting habitat requirements. For example, the discussions state that "[n]o treatments are proposed that would reduce old-growth structure or integrity where it occurs." (Ct. Rec. 7 Ex. 1 FEIS at III–258, III–581.) Accordingly, the Federal Defendants must demonstrate consistency with the IPNF LRMP habitat distribution standard for pileated woodpecker only if the project consequences on land not recognized as pileated woodpecker habitat will be more severe than on recognized habitat.[5] Because it is unclear if the Federal Defendants must perform such a demonstration, it is unclear if they

---

**5.** Plaintiffs cite the Old–Growth Habitat Management Standard 10. f., (Ct. Rec. 97 CD–ROM Disk 10 Other*IPNF_1987_For-est_Plan.pdf at II–29), as the pileated woodpecker IPNF LRMP habitat standard.

have violated NFMA; Plaintiff's motion for summary judgment on this issue is therefore DENIED.

■ The woodpecker section in the CNF portion of FEIS indicates that the project will not destroy woodpecker habitat and that project effects, relative to woodpecker habitat requirements, will be the same across the treatment areas. The CNF LRMP habitat standard for pileated woodpecker requires a minimum average of two hard snags per acre in each 300 acre reproductive areas. (Ct. Rec. 120 Ex. U at 4–39 ¶ 3.a.) There must also be a minimum average of two hard snags per acre on the 300 acre feeding area. (Id.) The standard for the northern three-toed woodpecker is a minimum average of two hard snags per acre in each 75 acre reproductive area. (Ct. Rec. 120 Ex. U at 4–39 ¶ 3.b.) These snags should be more than ten inches DBH, except that forty-five should be more than 12 inches DBH. (Id.) The CNF woodpecker section in the FEIS states that "[a]ll [treatment] alternatives would retain 4 snags per acre in dry forest types and 6 snags per acre in the moist forest types. In all cases, the snags would be designated from the largest d.b.h. size class available." (Ct. Rec. 7 Ex. 1 FEIS at III–796.) It further notes that "[a]ll alternatives would maintain at least the 100% potential population for snag and cavity dependent species in the timber harvest and prescription burn unit." (Ct. Rec. 7 Ex. 1 FEIS at III–797.) These statements indicate that the project will not harm existing woodpecker habitat and will treat recognized and unrecognized, but potential, woodpecker habitat the same. Accordingly, the Federal Defendants need not demonstrate consistency with the LRMP habitat distribution standard for this species. Plaintiffs' motion for summary judgment on this issue is DENIED.

■ The FEIS's discussion of the marten in the CNF project area concludes that the treatment alternatives meet the LRMP standards and guidelines for pine marten. (Ct. Rec. 7 Ex. 1 FEIS at III–793.) The CNF LRMP marten habitat standard provides that stands in the marten areas will have a crown cover of 50 to 100 percent and that natural snag densities and windthrown trees will be preserved. (Ct. Rec. 120 Ex. U at 4–40 ¶ 3.k.) It also sets forth detailed minimum objectives for snag size and density. The FEIS states that treatments would maintain canopy cover and hiding cover (35–60% crown closure) throughout the units and that snags would be retained in sufficient numbers to support a female, denning pine marten. (Ct. Rec. 7 Ex. 1 FEIS at III–792.) However, it is unclear if these results will be the same for treatment areas that are not designated as a pine marten units. Accordingly, it is unclear if the project will harm potential pine marten habitat and therefore if the Federal Defendants must demonstrate consistency with the CNF LRMP marten habitat distribution standard. Plaintiff's motion for summary judgment on this issue is therefore DENIED.

■ The barred owl is an old growth dependent species. The CNF portion of the FEIS states that no treatment is proposed for old growth dependent species habitat areas. (Ct. Rec. 7 Ex. 1 FEIS III–799.) However, as is discussed above, it is unclear if the Project affects old growth habitat by logging mature forests needed to fulfill old growth shortfall. Hence, it is unclear if the Federal Defendants must demonstrate consistency with the CNF LRMP barred owl habitat distribution standard. Plaintiff's motion for summary judgment on this issue is DENIED.

■ With respect to primary cavity excavators, the CNF LRMP requires the maintenance of "dead and defective tree

habitat capable of supporting at least 60 percent of the potential population of primary cavity nesters within land areas that are generally no larger than normal harvest unit size." (Ct. Rec. 120 Ex. U at 4–39 ¶ 3.c.) This standard appears to have been supplanted by the Interim Wildlife Standard of Amendment 2. Nonetheless, the FEIS's CNF woodpecker section states that "[a]ll alternatives would maintain at least the 100% potential population for snag and cavity dependent species in the timber harvest and prescribed burn units." (Ct. Rec. 7 Ex. 1 FEIS at III–797.) The CNF portion of the FEIS provides generally that "snags would be maintained at 100% of population potential for cavity nesters." (Ct. Rec. 7 Ex. 1 FEIS at III–801.) These statements indicate that existing primary cavity excavator habitat meets the LRMP and Amendment 2 standards and that project treatment will not destroy it. Plaintiffs' motion for summary judgment on this issue is DENIED.

## C. Water Quality

### 1. CWA Requirements and the Idaho Portion of the Project

■ Plaintiffs assert that the Federal Defendants' decision to approve and proceed with that portion of the Project in Idaho violates the CWA and is arbitrary and capricious. The CWA requires states to implement water quality standards with which federal agencies must comply. *See Oregon Natural Res. Council v. Lyng*, 882 F.2d 1417, 1424 (9th Cir.1989) (citing 33 U.S.C. §§ 1313, 1323). It also requires states to set forth procedures to control nonpoint sources of pollution such as logging. *See id.* (citing 33 U.S.C. § 1288(b)(F)-(K)). Proper implementation of these procedures, termed best management practices ("BMPs"), constitutes compliance with the CWA unless water quality monitoring reveals that the BMPs have permitted violation of these water quality standards. *See id.*

### a. Violation of the CWA

Plaintiffs claim that the Federal Defendants' decision violated the CWA because the IPNF portion of the Project (1) will cause additional sediment load to streams already degraded with respect to sediment and (2) improperly relies on state-approved BMPs to comply with CWA requirements.

### i. Addition of Sediment Load to Degraded Streams

Idaho's antidegradation policy provides that

[t]he existing instream beneficial uses of each water body and the level of water quality necessary to protect those uses shall be maintained and protected. Where the quality of waters exceeds levels necessary to support propagation of fish, shellfish and wildlife and recreation in and on the water, that quality shall be maintained unless the department finds, after full satisfaction of the intergovernmental coordination and public participation provisions of this chapter, and the department's planning processes, along with appropriate planning processes of other agencies, that lowering water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such reductions in water quality, the department shall assure water quality adequate to protect existing uses fully.

Idaho Code § 39–3603 (West 2000). The Ninth Circuit has held that this standard only obligates the Forest Service to maintain and protect the level of water quality necessary to protect existing instream water uses. *See Idaho Sporting Cong.*, 137 F.3d at 1153. With respect to nonpoint

sources, Idaho law provides in relevant part that

> [t]here shall be no requirement for persons who ... conduct nonpoint activities ... to meet water quality criteria other than those necessary for the full support of the existing beneficial use for the water body pertinent to ... the nonpoint activity ... in question.

Idaho Code § 39–3604 (West 2000).

The FEIS stated that no direct or indirect effects to beneficial uses are anticipated at the more local, tributary scale from harvest activities and road construction, though cumulative benefits due to watershed improvement and sediment reduction may be noticeable in some cases. (Ct. Rec. 7 Ex. 1 FEIS at III–150–III–174.) In the Priest Lake Ranger District Project area, no cumulative watershed-scale effects are anticipated and a net overall improvement in protection of water resources and values is generally expected locally. (Ct. Rec. 7 Ex. 1 FEIS at III–476—III–503.)

Plaintiffs assert that the beneficial effects conclusions are unsupported by quantitative data. They note that in the Projected Watershed Response tables, (Ct. Rec. 7 Ex. 1 FEIS at III–145—III–174, III–476—III–503), "annual sediment loading," or "sediment yield (%)," is reported as the percent change above the "estimated natural sediment yield" for the watershed. (Ct. Rec. 7 Ex. 1 FEIS at III–148—III–149, III–475.) However, "net associated risk" is expressed in tons of sediment per year and reflects the anticipated change in sediment risk associated with stream crossing construction or removal, a value "important in assessing watershed improvement work associated with the alternatives." (Ct. Rec. 7 Ex. 1 FEIS at III–149, III–475.) Because the variables are expressed in different units, and because no monitoring data supports the "net associated risk" estimates, Plaintiffs assert

the figures cannot support the conclusions regarding the Project's beneficial effects.

The Watershed Characteristics tables, (Ct. Rec. 7 Ex. 1 FEIS at III–122—III–144, III–444—III–475), however, list "estimated annual sediment," a value that appears to be the "estimated natural sediment yield," in tons per square mile of drainage area per year and list the drainage area of the watershed in square miles, (Ct. Rec. 7 Ex. 1 FEIS at III–121, III–443). Accordingly, although the reader must make several calculations, the FEIS presents data enabling comparison of the "annual sediment loading" and "net associated risk" for each alternative. This comparison is likely crude as the "annual sediment loading" value is not an absolute value but a value relative to the "estimated natural sediment value."

The "net associated risk" figures were "calculated based on measurements or estimates of road fill located at stream crossings." (Ct. Rec. 7 Ex. 1 FEIS at III–149, III–475.) Contrary to Plaintiffs' assertion, there is no requirement that such figures be supported by actual monitoring data. The Court finds the issue to be one of methodology and defers to the expertise of the Forest Service. *See Inland Empire v. Schultz*, 992 F.2d at 981.

The Project will cause no negative effects to existing beneficial uses. Therefore, it complies with Idaho's clean water standards, and does not violate the CWA. Plaintiffs' summary judgment motion with respect to this issue is therefore DENIED; the Federal Defendants' motion is GRANTED.

### ii. Reliance on State–Approved BMPs

The IPNF portion of the Project relies on the use of state-approved BMPs to mitigate the sediment loading effects of timber harvest, road construction

and site preparation treatment activities. (Ct. Rec. 7 Ex. 1 FEIS at III–150—III–174, III–476—III–503.) Proper implementation of BMPs by nonpoint sources constitutes compliance with the CWA unless water quality monitoring reveals that the BMPs have permitted violation of water quality standards. *See Lyng,* 882 F.2d at 1424. Plaintiffs assert that it is improper for the Project to rely on BMPs because the WQLS status of so many IPNF Project area streams demonstrates that BMPs have permitted violation of water quality standards and because the water quality monitoring program for the IPNF portion of the project is inadequate.

The Federal Defendants explain that the degradation that led to the WQLS designation of the streams either occurred during the 1960s through the 1980s before the current BMPs were in place or resulted from activities on non-Forest Service lands. (Ct. Rec. 121 at 43 11. 6–23.) They observe that BMPs have been revised and improved since the 1970s in response to observed and identified inadequacies and assert there is no evidence that the BMPs adopted in the Project are ineffective at protecting streams and fisheries. (Ct. Rec. 121 at 43 11. 23–26.) Accordingly, the Court concludes that the WQLS status of project area streams does not reflect the efficacy of Project BMPs.

The state-recognized BMPs that are to be used during Project design and implementation are set forth in the FEIS, (Ct. Rec. 7 Ex. 1 FEIS at II–35—I–36, app. F), together with a monitoring plan, (Ct. Rec. 7 Ex. 1 FEIS at II–50—II–56.) Water quality monitoring on IPNF Project areas includes monitoring of BMP and mitigation measure implementation and monitoring pursuant to the IPNF LRMP. (Ct. Rec. 7 Ex. 1 FEIS at II–50—II–52, II–54.) The IPNF LRMP water quality monitoring program provides for visual observations to see if BMPs are effective and for

selective quantitative effectiveness monitoring. (Ct. Rec. 7 Ex. 1 FEIS at II–51—II–52; Ct. Rec. 97 CD–ROM Disk 10 Other*IPNF_1987_Forest_Plan.pdf app. JJ at 3 ¶ 3.) Plaintiffs complain that the proposed monitoring plan will not reveal if Project BMPs have permitted water quality standards to be violated.

▇▇ Because sediment is the water quality pollutant of concern, the Court finds that visual observations, supplemented by period quantitative monitoring, are a reasonable method of water quality monitoring. Accordingly, the Court defers to the expertise of the Federal Defendants to prepare a water quality monitoring program adequate to determine the efficacy of Project BMPs. *See Marsh,* 490 U.S. at 378, 109 S.Ct. 1851.

Because the WQLS status of the IPNF Project area streams did not develop during the existence and use of the current BMPs, the Project water quality monitoring plan is adequate to determine the efficacy of the Project BMPs, and the Court is unaware of any data that showed at the time the Federal Defendants' issued their decision that Project BMPs permitted violation of water quality standards, it is not improper for the Federal Defendants to rely on Project BMPs to comply with the CWA. Plaintiffs' motion for summary judgment on this issue is DENIED; the Federal Defendants' motion is GRANTED.

**b. Violation of the Arbitrary and Capricious Standard**

Plaintiffs assert that given the already degraded nature of the streams in that portion of the Project in Idaho, it is arbitrary and capricious for the Forest Service to (1) rely on the same failed BMPs which resulted in the degradation and (2) proceed with the Project without careful water quality monitoring requirements that would quantify any sediment impacts, and

require mitigation measures to be implemented when certain thresholds are exceeded.

As has already been discussed, the Project BMPs did not govern the events that caused the WQLS designation of IPNF Project area streams. Regarding the allegation that the Federal Defendants should have required careful, quantitative water quality monitoring, the Court notes that it found the Project's water quality monitoring plan to be reasonable and that it must defer to the reasonable opinions of agency experts. The Federal Defendants' decision—which incorporated the adoption of the water quality monitoring plan—"need be only a reasonable, not the best or most reasonable, decision." *National Wildlife Fed'n v. Burford,* 871 F.2d 849, 855 (9th Cir.1989). Plaintiffs' motion for summary judgment on the ground that the Federal Defendants' decision was arbitrary and capricious because it relied on the Project BMPs and adopted the water quality monitoring plan set forth in the FEIS is therefore DENIED. The Federal Defendants' motion is GRANTED.

**2. NFMA Requirement for Consistency with the IPNF LRMP Water Quality Monitoring Program**

 The Project's water quality monitoring plan directly incorporates the IPNF LRMP water quality monitoring program. (Ct. Rec. 7 Ex. 1 FEIS at II–50.) The IPNF LRMP water quality monitoring program provides that road construction, timber harvest operations, mining, grazing and recreation use will be monitored by "implementation monitoring." (Ct. Rec. 97 CD–ROM Disk 10 Other*IPNF_1987_Forest_Plan.pdf app. JJ at 2 ¶ 2.) Implementation monitoring consists of contract and project administration and internal field reviews, during which *visual observations* are made to see if BMPs are effective. (Id.) It is to implementation monitoring that the FEIS refers when it states that

visual observations will be made. (Ct. Rec. 7 Ex. 1 FEIS at II–52.) The IPNF LRMP also provides for "effectiveness monitoring," which is quantitative. (Ct. Rec. 97 CD–ROM Disk 10 Other*IPNF_1987_Forest_Plan.pdf app. JJ at 2 ¶ 3.) However, such monitoring is usually done on a sample basis and emphasizes major non-point source contributing activities such as road construction and maintenance, related erosion control BMPs, riparian area management and major mining projects. (Id.) Accordingly, that the Project's water quality monitoring plan prescribes implementation monitoring that includes visual observations is consistent with the IPNF LRMP.

Plaintiffs' motion for summary judgment on the basis that the IPNF Project area water quality monitoring plan violates NFMA by calling for visual observation is DENIED. The Federal Defendants' motion is GRANTED.

**3. LRMP Requirement to Conduct BMP Effectiveness and Validation Monitoring**

 Plaintiffs assert that the Forest Service has violated the IPNF LRMP by failing to conduct BMP effectiveness and validation monitoring. Plaintiffs' claim, construed within the parameters of this suit, seems to be that the absence of such monitoring data renders the Federal Defendants' decision regarding the IPNF portion of the Project arbitrary and capricious.

The IPNF LRMP water quality monitoring program sets forth a variety of types of monitoring that are to be conducted for land management activities. (Ct. Rec. 97 CD–ROM Disk 10 Other*IPNF_1987_Forest_Plan.pdf app. JJ.) However, the program provides that

[b]ecause of budgetary changes and the need to revise monitoring strategies as information needs change, site specific

monitoring needs are not presented in this plan. This discussion describes the process by which detailed monitoring plans will be developed and implemented to address water quality on the Forest. (Id. at 1.) Monitoring plans are to use four monitoring categories: baseline, implementation, effectiveness and validation. (Id. at 1.) Water Quality Monitoring Plans of Operation are to be prepared for each monitoring project, with the Forest-wide Water Quality Monitoring Plan summarizing individual monitoring plans of operation. (Id. at 2.) A written report documenting all monitoring results is to be prepared annually. (Id. at 2.) The program provides that effectiveness monitoring will usually be done on a sample basis, mainly (1) where there are issues or concerns relating to unknown BMP effectiveness, (2) where the effectiveness of a specialized BMP is questioned, and (3) as a demonstration of a BMP's effectiveness. (Id. at 3 ¶ 3.) Results may suggest the need to revise or modify BMPs. (Id. at 4 ¶ 3.)

The Forest Service conducts a watershed monitoring program that monitors approximately 18 in-stream sites, (Ct. Rec. 132, Third Decl. Richard Patten, Ex. 2., at 3–5), though it is unclear what effectiveness or validation monitoring is or has been performed. Nonetheless, the apparent absence of effectiveness monitoring data from the record does not render the decision regarding the IPNF portion of the Project arbitrary and capricious. Effectiveness monitoring is essentially done on an as-needed basis at the discretion of the Forest Service.

The apparent absence of validation monitoring data from the record also does not render the decision regarding the IPNF portion of the Project arbitrary and capricious. The IPNF LRMP water monitoring program provides only that the amount of validation monitoring will be very limit-

ed and that, as of August 1989, a planned validation effort is sediment yield monitoring to compare R1/R4 sediment yield predictions with measured sediment yield. Since the sediment yield for the Project was calculated using the newer WATSED model, rather than the R1/R4 model, validation data for the R1/R4 model would have been tangentially relevant at best.

The apparent absence of effectiveness and validation monitoring data from the record does not render the Federal Defendant's decision regarding the IPNF portion of the Project arbitrary and capricious; the LRMP does not require that such monitoring occur and any effectiveness monitoring results would have been incorporated in the Project BMPs. Plaintiffs' motion for summary judgment on this issue is therefore DENIED.

## 4. LRMP Requirement Regarding WATSED Model Calibration

Plaintiffs assert that the Federal Defendants violated the IPNF LRMP by failing to annually validate and recalibrate WATSED "on eleven indicator streams." The Court construes Plaintiffs' claim to assert that the failure to validate and recalibrate WATSED in accordance with the IPNF LRMP renders the WATSED data unreliable and the Federal Defendants' decision regarding the IPNF portion of the Project arbitrary and capricious.

The IPNF LRMP provision that Plaintiffs quote is a requirement to "validate R–1/R/4 model" annually and adjust the model if the actual value is more than plus or minus 20% of the model prediction. (Ct. Rec. 97 CD–ROM Disk 10 Other*IPNF_1987_Forest_Plan.pdf at IV–11.) The LRMP provides that the source of information to be used for the validation is "11 streams." (Id.)

It is clear that taken literally, the provision Plaintiffs quote does not apply to WATSED. The validation and calibration

**1234**

requirements of the R–1/R/4 model may have been rendered obsolete by improvements in WATSED. Neither party disputes that WATSED was calibrated for the IPNF in 1991 and has not been recalibrated since. However, even under the R–1/R4 model requirement, recalibration is only required when the actual value is more than about 20% of the modeled value. Richard Patten, the IPNF Forest Hydrologist and Watershed Program Leader, states that the components of WATSED have been continuously monitored and re-evaluated since 1991 and that based on his experience using WATSED on the IPNF, "there does not appear to be any need to revise the parameters of the model." (Ct. Rec. 7 Ex. 9 at 3–4 ¶ 12.)

Because the IPNF LRMP requirement concerning R–1/R/4 validation and adjustment does not by its terms apply to WATSED, any failure of the Forest Service to meet that requirement with respect to WATSED is not a basis for finding that the WATSED data is unreliable or that the Federal Defendants acted arbitrarily and capriciously in using it. Plaintiffs' motion for summary judgment on this issue is therefore DENIED; the Federal Defendants' motion is GRANTED.

**5. NEPA Requirements**

■ Plaintiffs assert that with respect to water quality issues, the Federal Defendants' decision violated NEPA or was arbitrary and capricious because the FEIS fails to contain a reasonably thorough discussion of the significant aspects of the Project's probable environmental consequences. Specifically, Plaintiffs claims that the FEIS (a) improperly assumed that most of the trees to be logged would be dead or dying, (b) failed to disclose WATSED's non-validated/recalibrated status and to disclose and demonstrate compliance with the WATSED forest plan monitoring standard, (c) failed to disclose that WATSED does not evaluate in-chan-

nel and stream-bank erosion, sediment and water discharge from rain-on-snow events, or the effects of large destructive events, (d) improperly used WATSED to predict potential increases in sediment or water yield, (e) failed to disclose the water and sediment yield for the first six years of the Project, and (f) failed to disclose significant adverse environmental impacts from rain-on-snow sediment/water discharge events and from instream and streambank sediment discharges.

**a. Assumption Regarding Dead and Dying Trees**

The FEIS repeatedly implies or states that the estimates of the Project's impacts to water yield are based on the assumption that the Project will harvest mostly timber that is dead, dying or expected to die. (Ct. Rec. 7 Ex. 1 FEIS at III–150—III–174, III–476—III–503, III–725—III–738.) The assumption derives from the definition of the two types of tree cutting or harvesting that will occur under the Project. Regeneration harvest generally will occur in stands

> where greater than 50% of the stand of trees are dead and dying or are expected to die during the beetle outbreak [or,] for the Newport Ranger District, ... are stands where less than 40 square feet of live basal area remain[ ]. Harvesting involves removing most of the dead trees and some green trees ... [g]enerally [resulting in] less than 30% of the trees remaining on these areas.

(Ct. Rec. 7 Ex. 1 FEIS "Explanations of Terminology Used in this Final Environmental Impact Statement" "Silvicultural Termination" "Regeneration Harvest".) Selective harvest will

> occur in forest stands where less than 50% of the stand is dead or dying or is expected to die from the beetle outbreak and other disturbance agents....

[though] some selective harvest would be done in areas where more than 50% of the stand is dead or dying. For the Newport Ranger District, selective harvest would be used in all stands where greater than 40 square feet of live basal area remain. On most areas, selective harvest would remove only dead trees, but in some areas, where there is the opportunity to maintain or enhance the growth of the desired western larch or ponderosa pine or move the stand towards desired structural stages, green trees would be removed in addition to the dead Douglas-fir. The green trees to be removed would generally be the smaller trees which would be 'thinned out.'

(Id. "Selective Harvest.") Thus, regeneration harvesting will generally log at least 70% of the trees in a stand, with the harvested trees consisting of most of the more than 50% of the stand that is trees that are dead, dying or expected to die and some of the green trees. Selective harvest generally will remove only dead trees but may also remove green, generally smaller, trees.

The Court evaluates the Federal Defendants' decision to approve and proceed with the Project in light of the information available to the Federal Defendants at the time of the decision and in light of the administrative record. *See Nevada Land Action Ass'n v. U.S. Forest Service,* 8 F.3d 713, 718 (9th Cir.1993) (a court's review under the arbitrary and capricious standard must be based on the record that was before the agency at the time of the decision). Accordingly, a tree may be classified as dead, dying or expected to die only if it was dead, dying or expected to die *at the time the Federal Defendants reached their decision.* Post-decision tree mortality, beetle behavior, and tree mortality predictions are irrelevant.

Plaintiffs base their claim regarding the number of green trees harvested under the Project on post-decision timber cruise data and surveys. The Court finds, however, that for the two reasons set forth hereinafter that the data and surveys fail to demonstrate that the FEIS falsely assumes that the Project will log mostly timber that, at the time the Federal Defendants reached their decision, was dead, dying or expected to die. Accordingly, Plaintiffs have not borne their burden of proving that the Federal Defendants' decision is arbitrary and capricious. *See Preston,* 734 F.2d at 1372; *Varicon Int'l,* 934 F.Supp. at 444; *Natural Res. Def. Council,* 806 F.Supp. at 1272.

First, the post-decision timber cruise data cited by Plaintiffs does not, by itself, support Plaintiffs' claim regarding the number of green trees that will be harvested under the Project. The timber cruise data is taken from the Project's timber sale contracts. The data identifies the number of trees, by species, that are included in each contract. It does not state whether the trees are dead, dying, expected to die or healthy. Plaintiffs erroneously assume that only the Douglas-fir trees are dead, dying or expected to die and that all other trees are "green." However, disturbance agents other than the Douglas-fir beetle, such as wind, snow, ice and root disease, have killed trees besides Douglas-fir and have caused high mortality in forest stands. (Ct. Rec. 7 Ex. 1 FEIS at I–13.) These trees will also be harvested as dead trees under the Project. (Id.) The timber cruise data, standing alone, therefore fails to show the number of green trees that will be harvested under the Project.

Second, data from the surveys referenced by Plaintiffs fails to support Plaintiffs' claim that the FEIS falsely assumes that the Project will log mostly timber

that, at the time the Federal Defendants reached their decision, was dead, dying or expected to die. The surveys were conducted by Plaintiffs or their experts on October 30, 1999, and September 4, 2000. (Third Decl. Dr. Arthur D. Partridge, Ph.d, Ct. Rec. 106, ¶¶ 2–3; Second Decl. Barry Rosenberg, Ct. Rec. 78, ¶¶ 25–30; Decl. William Egolf, Ct. Rec. 79, ¶¶ 3–5.) The surveys examine only Douglas-fir trees, ignoring trees of other species that were included in the Project because they were dead, dying or expected to die at the time the Federal Defendants made their decision. The surveys count as "live" all Douglas-fir that are not dead. They do not subtract from the "live" count the number of Douglas-fir trees that the Forest Service might reasonably have expected to die, whether from a then-existing beetle infestation that subsequently proved non-fatal (Ct. Rec. 7 Ex. 2, Priest Lake Ranger District, Project Files CD ROM # 2, Vegetation*Methodology*P_VE_1–140 at 2 ¶ 7)), or from a beetle attack anticipated as a result of the tree's proximity to infected trees or another destructive agent. In addition, the survey data is in terms of number of trees. The FEIS measures the timber that will be logged in terms of the percent of the stand. No correlation between the number of trees and the percent of the stand is provided. Finally, Plaintiffs' direct numeric comparison of their survey results with the Forest Service's survey notes is improper because (1) Plaintiffs' survey areas are not coextensive and might not even overlap with the Forest Service's survey areas, (2) Plaintiffs provide no support for their tacit assertion that the Project areas to which contain Plaintiffs' survey areas are sufficiently uniform that Plaintiffs' survey data is valid for the encompassing Project areas, and

(3) the total area of Plaintiffs' surveys is too small compared to the total area of the Project and of the Forest Service's survey areas to be statistically significant.[6]

Plaintiffs also assert that the Federal Defendants' decision is arbitrary and capricious and violates NEPA because the Forest Service's surveys do not provide the quantitative scientific data needed to support the FEIS' analysis, survey forms and therefore quantitative data are lacking for several Project timber contract sale units, and the general guideline for marking Douglas-firs for harvest is flawed. However, the Court finds that the FEIS contains a reasonably thorough discussion

Plaintiffs assert that the Forest Service's surveys, which were walkthrough reviews rather than formal surveys like the ones Plaintiffs conducted on Units 4, 5 and 29, do not provide the quantitative scientific data needed to support the FEIS' analyses. However, the differences in approach employed by Plaintiffs and the Forest Service is justified by the purpose of the site visits. The Forest Service was determining the status of the units and viewing the surroundings to predict what was likely to occur. (Ct. Rec. 132 Decl. David F. Cobb, Ex. 3, ¶¶ 5–6.) Plaintiffs were determining the exact status of the plots in order to establish the accuracy of the Forest Service's predictions. Because the Forest Service's ultimate purpose was predictive in nature, the Court finds it reasonable that the Forest Service did not conduct formal surveys for most units but decided on treatment prescriptions based on aerial and field observations. The field notes from the site visits of the Forest Service personnel provide sufficient hard data to support the selection of treatment prescriptions and the FEIS' analysis. *See*

6. Plaintiffs surveyed one and one quarter acres of Unit 4 of the Tola Timber Sale and two thirds of a unit of the Flat Moore Timber Sale, both in the Priest Lake Ranger District Project area.

*Inland Empire v. Schultz*, 992 F.2d at 981 (deferring to agency expertise on choice of methodology unless the agency completely failed to address a factor essentially to a truly informed decision not to prepare an EIS).

Plaintiffs note that the Project file lacks survey forms for seventeen of the thirty-two units listed for the Tola Timber Sale and assert that, as a result, there was no quantifiable data supporting the decision prescribe regeneration harvest treatment for them.

A review of the Project files reveals that of the seventeen units identified by Plaintiffs, only fifteen in fact lack survey forms: Units 2b, 2c, 3, 3a, 4a, 6, 7, 9, 11, 15, 15a, 15b, 19, 20, 24 and 26. (Ct. Rec. 7 Ex. 2, Priest Lake Ranger District, Project Files CD Rom # 2, Vegetation*Treatment_Area*Tola*P_VE_127.pdf.) Four of those units have a selective harvest prescription of salvage (Units 7, 11) or improvement cut (Units 15b, 26). Accordingly, assumptions about the effects of the treatment of those units can be made without a field survey since selective harvest generally removes only dead trees, though in some areas small green trees may be removed. The remaining eleven units cover a total of 206 acres and have a regeneration harvest prescription.

NEPA regulations provide that if "incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement." 40 C.F.R. § 1502.22(a) (1999). It appears that survey information for the eleven units was either accidentally omitted from the project files or was not obtained due to time constraints. In the event the information was never obtained, there was nonetheless adequate hard data such that the information on these units was not incomplete. First, aerial observations identified the minimum extent of beetle infestation. Second, well reasoned data, based on many observations made in the other Priest Lake Ranger District Project areas, was used to fill in gaps left by the aerial observations.

Finally, Plaintiffs assert that the general marking guideline for DF/GF trees dying from root disease is flawed because it assumes that once black/dark brown staining at the base of the tree bole and/ or crown fading symptoms appear, the tree normally dies within a year and therefore should be marked for cutting. (Fifth Decl. Barry Rosenberg, Ct. Rec. 145, Attach. 2 at PL–1 ¶ I.2). Plaintiffs assert that such a prediction is not possible, especially based on the symptoms described in the guideline. The Court notes that experts can disagree and finds that the Forest Service reasonably relied on the expertise of the guideline's author, Mr. Cobb, given his experience in the field generally and with the Priest Lake Ranger District specifically. *See Marsh*, 490 U.S. at 378, 109 S.Ct. 1851.

Based on the record that was before the Federal Defendants when they decided to approve and proceed with the Project, on the information that was available at that time, the Court finds that Plaintiffs have not proved that the Federal Defendants' decision was arbitrary and capricious on the ground that the FEIS underestimates the Project's impacts to water yield and sediment. *See Preston*, 734 F.2d at 1372 (holding that the challenging party bears the burden of proving a decision is arbitrary and capricious). The FEIS contains a reasonably thorough discussion regarding the amount of timber that is dead, dying or expected to die in the Project area and the effect that its removal, plus the removal of green trees, will have on water yield, and therefore on sediment.

Accordingly, the Federal Defendants have taken a hard look at the project's consequences to water yield and sediment. *See National Parks & Conservation Ass'n,* 222 F.3d at 680. Plaintiffs' motion for summary judgment on this issue is DENIED; the Federal Defendants' motion is GRANTED.

**b. WATSED's Validated/Recalibrated Status and the IPNF LRMP Standard**

Plaintiffs assert that the Federal Defendants' decision violates NEPA because the FEIS does not disclose that WATSED was not validated or recalibrated in accordance with the IPNF LRMP. Since the IPNF LRMP validation and recalibration requirement to which Plaintiffs refer does not apply to WATSED, see III.C.4. above, "LRMP Requirement Regarding WATSED Model Calibration," the failure to disclose that WATSED does not comply with the requirement does not violate NEPA. Accordingly, Plaintiffs' motion for summary judgment on this issue is DENIED; the Federal Defendants' motion is GRANTED.

**c. Disclosure of WATSED's Failure to Evaluate In–Channel and Stream–Bank Erosion and Effect of Rain–on–Snow and Large Destructive Events**

▆▆▆▆ Plaintiffs assert that the Federal Defendants' decision violates NEPA because the FEIS does not disclose that WATSED does not evaluate in-channel and stream-bank erosion, sediment and water discharge from rain-on-snow events, or the effects of other large destructive events.

An environmental impact statement must contain high quality information and accurate scientific analysis; it must also concentrate on issues that are significant to the action and not amass needless detail. *See* 40 C.F.R. §§ 1500.1(b) (1999). When evaluating reasonably foreseeable significant adverse impacts on the human environment, an FEIS shall state if there is incomplete or unavailable relevant information. *See* 40 C.F.R. § 1502.22 (1999).

▆▆▆▆ The Court finds that a description of WATSED's shortcomings is a description of a methodology, rather than a disclosure of incomplete or unavailable information. For an environmental impact statement to contain high quality information, it must include a description of the methodologies it relies upon. For an environmental impact statement to concentrate only on significant issues, the methodology description should set forth only those methodology shortcomings that are relevant in light of the environmental impacts the methodology is used to analyze.

WATSED is used in the FEIS to (1) assess existing watershed conditions, (2) to calculate sediment yield percent, and (3) to estimate the effects of the proposed timber harvest, road construction and reconstruction and fuel treatment activities for the peak flow analysis. (Ct. Rec. 7 Ex. 1 FEIS at III–115, III–148, III–149, III–437, III–475, III–709.) Timber harvest can increase the impact of rain-on-snow events which in turn can increase peak flows. (Decl. J. Allen Isaacson, Ct. Rec. 113, at 30 ¶ 43.) Since WATSED is used to estimate the effects of the proposed timber harvest on peak flow, the description of WATSED contained in the FEIS should state that WATSED does not incorporate the effects of rain-on-snow events in its peak flow analysis. Peak flows associated with rain-on-snow events can cause in-channel erosion, thereby increasing the sediment transported by the streams. (Fed. Defs' Objections Pls.' Statement Facts, Ct. Rec. 133, at 32 ¶ 46.) Since WATSED is used to estimate the sediment yield percent or the estimated annual sediment loading for the watershed, the WATSED description in the FEIS should

also state that WATSED does not evaluate in-channel and stream-bank erosion.

The description of the WATSED model contained in the FEIS states that

Models, such as WATSED, are designed to address and integrate a vast and complex number of conditions and organize the evaluation according to the rule sets established by the author. In the case of WATSED, the rule sets were based on research, and data and analysis collected locally. The models, however, also include simplifying assumptions, and do not include all possible controlling factors. Therefore the use of models is to provide one set of information to the technical user, who, along with a knowledge of the model and its limitations, other models, data, analyses, experience, and judgement must integrate all those sources to make the appropriate findings and conclusions.

(Ct. Rec. 7 Ex. 1 FEIS, III–442.) Although the description states that models such as WATSED include simplifying assumptions and do not include all possible controlling factors, the Court finds this is too general with respect to peak flow and in-channel and stream-bank erosion. To be both high quality and significant, the description should specifically state that WATSED does not incorporate the effects of rain-on-snow events in its peak flow analysis and that WATSED does not evaluate in-channel and stream-bank erosion. Because it does not, the Federal Defendants' decision violates NEPA. Accordingly, Plaintiffs' motion for summary judgment is GRANTED; the Federal Defendants' motion is DENIED.

**d. Use of WATSED to Predict Sediment and Water Yield Increases**

Plaintiffs assert that the Federal Defendants' decision was arbitrary and capricious because the Forest Service improperly used WATSED to predict potential increases in sediment and water yield that would result from the implementation of project alternatives. In support of this claim, Plaintiffs cite to a supplemental final environmental impact statement for an action apparently unrelated to this Project. Stating that it was improper to use WATSED to conclude that there would be no sediment increases in certain streams and a five percent increase in another stream if a particular project alternative were implemented, the document explains that WATSED

was not designed, nor can it be used, for predicting absolute sediment levels by activity. The landtype data, erosion rates, and land use variables used in the model are not refined enough to serve as accurate predictors of sediment increases. The value of the model is to allow the user to visualize the relative weighting of different land use practices and mitigation techniques in reducing relative sediment loadings. Consequently, determinations of 'actual' sediment loadings based on modeled output are invalid.

(Decl. Barry Rosenberg, Ct. Rec. 39, Supplement to the Packsaddle FEIS, Ex. A.) Noting that WATSED was derived from the WATBAL model and that WATBAL was derived from the R–1/R4 model, Plaintiffs also refer to the R–1/R4 user's guide. A limitation of the R–1/R4 model is that its "outputs are primarily intended to indicate trends and to compare management alternatives and secondarily to provide quantified estimates of sediment yield." (First Decl. Ronald D. Mitchell, Ct. Rec. 5, "Evaluating the WATBAL Sediment Loading Model, Clearwater National Forest, Idaho," Ex. 5, at 235–36.) Finally, Plaintiffs cite a scientific paper evaluating WATBAL which found, in one of two watersheds studied, that "the WATBAL model consistently underestimates the amount of sediment reaching the stream. In fact,

not once did WATBAL overestimate sediment loading." (Ct. Rec. 5 Ex. 5 at 241.)

The FEIS does not purport to predict the actual sediment and water yield levels that would result from each project alternative. Rather, the sediment yield and peak flow values identified by alternative are relative to, and are expressed as percentages of, the estimated natural sediment and peak flows. The IPNF Watershed sections state "[s]ediment yield percent is the estimated annual sediment loading for the watershed and *reported as the percent change above the estimated natural sediment yield* for the watershed.... Sediment yield percent is calculated for each alternative using the WATSED model." (Ct. Rec. 7 Ex. 1 FEIS at III–148, III–475 (emphasis added).) The sections also explain that "peak flow represents the change in runoff, and is expressed for each watershed as *a percent change from the estimated 'natural' peak month discharge*. The WATSED model also was used for this analysis to estimate the effects of the proposed timber harvest, road construction and reconstruction, and fuel treatment activities." (Ct. Rec. 7 Ex. 1 FEIS at III–149, III–475 (emphasis added).) Finally, the Direct, Indirect and Cumulative Effects portion of the Coeur d'Alene River Ranger District Watershed section states that "[t]he WATSED model was used as an assessment tool to display the potential increases in water or sediment yield should any of the alternatives be implemented." (Ct. Rec. 7 Ex. 1 FEIS at III–476.) Accordingly, the Forest Service's use of WATSED is consistent with the admonitions in the Packsaddle FEIS Supplement and the R–1/R4 user's guide.

With respect to the scientific paper cited by Plaintiffs, the Federal Defendants state that the Forest Service found the study to be flawed and to provide insufficient evidence that WATSED is an inappropriate analysis tool. Because the paper concerned WATBAL rather than WATSED, the Court finds reasonable and defers to the findings of the Forest Service's experts. *See Marsh*, 490 U.S. at 378, 109 S.Ct. 1851.

The Court finds that the Forest Service's use of WATSED was not improper and did not cause the Federal Defendants' decision to be arbitrary and capricious. Plaintiffs' motion for summary judgment on this issue is DENIED; the Federal Defendants' motion is GRANTED.

### e. Disclosure of Water and Sediment Yield for Project's First Six Years

Plaintiffs assert that the Federal Defendants' decision violates NEPA because the FEIS fails to disclose WATSED's predictions for sediment yield and peak flow for the first six years of the Project—information Plaintiffs allege is crucial to understanding the Project's impacts. At the hearing before the Court on November 20, 2000, Plaintiffs affirmed that they did not administratively exhaust this claim. However, they argue that exhaustion should be excused because the FEIS' failure to disclose the information prevented them from being aware of the issue.

Because NEPA does not explicitly provide for judicial review, claims for judicial review under NEPA must be brought pursuant to the APA. Under the APA, a party seeking judicial review of an administrative decision must first exhaust administrative remedies where (1) required to do so by agency rule and (2) the administrative action is made inoperative pending that review. *See Darby v. Cisneros*, 509 U.S. 137, 146–48, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). Forest Service regulations provide that federal judicial review of decisions in a ROD is inappropriate unless the plaintiff has first sought to invoke and exhaust the appeal procedures available under 36 C.F.R. § 215.1 *et seq.*, *see* 36 C.F.R. § 215.20 (1999). If an ap-

peal is filed, implementation of the decision "may not occur for 15 days following the date of appeal disposition." 36 C.F.R. § 215.10(b) (1999). Because Plaintiffs assert that the Federal Defendants' decision violates NEPA, they are in fact appealing the RODs, which may not be implemented while an appeal is pending. Plaintiffs must exhaust the administrative appeal procedures before they can seek judicial review of the Federal Defendants' decision.

 Plaintiffs assert that their failure to exhaust does not bar their claim because they did not become aware of what the first six years of WATSED data shows until November 1999, long past the deadline for filing an administrative appeal. A plaintiff's failure to exhaust may be forgiven if he lacked a meaningful opportunity to challenge the agency's action during the review period. *See Northwest Tissue Ctr. v. Shalala,* 1 F.3d 522, 530 (7th Cir.1993). There is no meaningful opportunity to challenge an agency action when, for example, the party has inadequate notice that it will be affected by the action. *See id.* Here, the Court permits Plaintiffs to assert this claim in this case.

The estimated potential responses of sediment yield and peak flow for each alternative were calculated using WATSED for every year from 1998 through 2009. (Ct. Rec. 7 Ex. 1 FEIS at III–149, III–475; Ct. Rec. 113 Ex. 2.) The estimates for 1998, the "existing condition," are shown in the tables depicting Watershed Characteristics, Condition Indicators, and Dominant Watershed Disturbances. (Ct. Rec. 7 Ex. 1 FEIS at III–120, III–122—III–144, III–442, III–444—III–470.) The estimates for 2006 are shown in the tables depicting the "Projected Watershed Response." (Ct. Rec. 7 Ex. 1 FEIS at III–120, III–149, III–150—III–174, III–442, III–475, III–476—III–503.) The WATSED data for each year from 1998 through 2009, at least in summary form, appears to be contained in the electronic Project Files, (Ct. Rec. 97, Databases & Documents, CD–ROM Disk 8, Database*Watershed*bugwork subdirectories).

Data estimated for 2006 was selected and set forth in the FEIS as the "Projected Watershed Response" data because "timber sale contracts are typically completed within five years, and modeled responses typically appear to be concentrated in a five to ten-year period following initiation of the project." (Ct. Rec. 7 Ex. 1 FEIS at III–120, III–442.) Plaintiffs assert that this statement is incorrect. Although Plaintiffs support their position, and the Federal Defendants respond, primarily by discussing the two types of erosion factored into the WATSED analysis, surface erosion and mass erosion, the WATSED summary results themselves suggest that sediment yield is estimated to be at its highest during the first four to six years of the Project. (Ct. Rec. 113 Ex. 2.) While the Court is not ruling on the validity of the FEIS's conclusions regarding the peak and cumulative sediment yield and peak flow values, the Court finds that the WATSED data for the modeled years should have been disclosed, either in the FEIS itself or by reference in the FEIS to the location in the administrative where the data is found. *See Idaho Sporting Cong.,* 137 F.3d at 1150; *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir.1980). Because the data was not disclosed in the FEIS or incorporated in the FEIS by reference, the Federal Defendants' decision violated NEPA. Plaintiffs' motion for summary judgment is GRANTED with respect to this issue; the Federal Defendants' motion is DENIED.

**f. Disclosure of Impacts from Rain–on–Snow Discharge Events and from Instream Sediment Discharges**

 Plaintiffs assert the that Federal Defendants' decision violates NEPA be-

cause the FEIS fails to disclose significant adverse environmental impacts from rain-on-snow sediment/water discharge events and from instream and streambank sediment discharges. Plaintiffs further assert that the decision is arbitrary and capricious and violates NEPA because the IPNF Forest Service did not apply its guidelines for analyzing potential adverse impacts from rain-on-snow events.

An environmental impact statement must provide a "full and fair discussion of significant environmental impacts." 40 C.F.R. 1502.1 (1999). Impacts shall be discussed in proportion to their significance, with there being only a brief discussion of other than significant issues. 40 C.F.R. § 1502.2(b) (1999).

### i. Rain–on–Snow Sediment/Water Discharge Events

The Federal Defendants assert that the FEIS does not discuss the environmental impacts of the Project due to rain-on-snow events because they were not deemed to be significant. (Ct. Rec. 132 Ex. 2 at 5 ¶ 13.) Plaintiffs disagree with this conclusion.

The FEIS concludes that the Project will not affect runoff beyond what is altered by beetle-induced tree mortality. Richard Patten explains that since the Project focuses primarily on removing only those trees killed by or susceptible to the Douglas-fir bark beetle, and since the openings created by the Project are widely dispersed throughout the watershed and are not substantially connected, there is no apparent risk of flooding in any alternative. (Ct. Rec. 132 Ex. 2 at 6–7 ¶ 17.)

Plaintiffs reply that the Project will create connected, large openings lacking resistance elements. They point to the Bi-

narch Timber Sale which will create a regeneration opening of 195 acres in Unit 6, (Ct. Rec. 69, Decl. Peter N. Zimmerman, Ex. 3, DFB Implementation Review & Monitoring File Binarch Area, Attach. 6). They cite to David F. Cobb's field notes, (Ct. Rec. 132 Ex. 3 Attach. B), regarding Tola Unit 4 which state that overstory removal will probably be needed after 5–10 years to reduce competition, a removal that Plaintiffs allege will leave the area with a canopy equivalent to that of a clearcut. They note that the timber sale maps demonstrate that in some areas, units are sufficiently close to each other as to have streams flowing through or adjacent to them.

The key is that the Project focuses primarily on removing only those trees killed by or susceptible to the Douglas-fir beetle. Accordingly, the Project's effects will not differ significantly from what would naturally result. Even where green trees will be harvested, generally at least 20% of the canopy will remain and provide resistance elements.[7] (Ct. Rec. 69 Ex. 3, DFB Implementation Review & Monitoring File Reference or Tracking Documents Priest Project Wide Documentation, Attach. 5.) Although Mr. Cobb's field notes mention overstory removal, the Project does not call for it and nothing indicates how widespread such removal might be, when or how such removal might be conducted, or what its effects might be.

The Court finds that the Federal Defendants reasonably determined that there would be no significant environmental impacts from the Project due to rain-on-snow events. Accordingly, they did not violate NEPA by only briefly discussing rain-on-snow events.

---

**7.** However, only 5–15% of the canopy will remain following regeneration harvest in some CNF and Priest Lake Project units that are 9 to 38 acres in size and in two CNF units that are 40 and 53 acres. (Ct. Rec. 69 Ex. 3, DFB Implementation Review & Monitoring File Reference or Tracking Documents Priest Project Wide Documentation, Attach. 5.)

Although Plaintiffs assert that the Forest Service has specific guidelines for analyzing the impacts of rain-on-snow events, the Federal Defendants respond that no such guidelines exist. Plaintiffs refer to a June 1993 document titled "IPNF Guidelines for Watershed and Stream Channel Evaluations and Project Implementation" that provides for rain on snow risk analyses for head-water and project area drainages, as is needed to define cumulative effects. (Fourth Decl. Barry Rosenberg, Ct. Rec. 131, at 12.) Plaintiffs claim that the risk analysis referred to is one developed by former IPNF Supervisory Hydrologist Gary Kappesser and that the Federal Defendants violated NEPA and were arbitrary and capricious in failing to use it. The Federal Defendants explain that Kappesser's risk analysis, set forth in his "Procedure for Evaluating Risk of Increasing Peak Flows from Rain on Snow Events by Creating Openings in the Forest Canopy," is an undocumented, unpublished and unverified procedure that Mr. Kappesser experimented with about ten years ago. (Ct. Rec. 132 Ex. 2 at 7 ¶ 18.) They state that while it may have been used for a few projects in the past, it is not a consistently applied guideline. (Id.) The Court defers to the Forest Service's expertise in choosing a methodology for analyzing the impacts of rain-on-snow events. *See Inland Empire v. Schultz,* 992 F.2d at 981. Since the "guideline" to which Plaintiffs refer has not been consistently applied by the IPNF Forest Service, the Federal Defendants' decision neither violated NEPA nor was arbitrary and capricious for failing to apply it.

Plaintiffs' motion for summary judgment on the grounds that the Federal Defendants' decision violated NEPA and was arbitrary and capricious because the FEIS does not disclose significant adverse environmental impacts from rain-on-snow events and because the IPNF Forest Service did not apply its guidelines for analyzing rain-on-snow impacts is DENIED; the Federal Defendants' summary judgment motion is GRANTED.

#### ii. Instream and Streambank Sediment Discharges

 The Federal Defendants assert that the FEIS does not discuss the environmental impacts of the Project due to instream and streambank sediment discharges because such impacts were not deemed to be significant. (Ct. Rec. 132 Ex. 2 at 5 ¶ 13.) Plaintiffs claim that this conclusion is undermined by the failure to anticipate that a high percentage of logged trees would be living and provide canopy closure to rain-on-snow events that can lead to severe instream and streambank erosion.

The Court evaluates Plaintiffs' claim in light of the information that was available to and the record that was before the Federal Defendants when they made their decision. *See Nevada Land Action Ass'n,* 8 F.3d at 718. As has already been discussed, Plaintiffs have not demonstrated that when the Federal Defendants made their decision, they erroneously assumed that the Project will harvest mostly timber that is dead, dying or expected to die. Thus, the Federal Defendants reasonably determined that there would be no significant environmental impacts from the Project due to rain-on-snow events. Since the Project was determined to have no significant impacts as a result of rain-on-snow events, and since peak flows associated with rain-on-snow events can cause in-channel erosion, the Federal Defendants reasonably determined that no significant adverse environmental impacts would arise from the Project due to instream and streambank sediment discharges. Accordingly, their decision to adopt and implement the Project does not violate NEPA on the grounds that the FEIS failed to disclose

significant adverse environmental impacts from instream and streambank sediment discharges. Plaintiffs' motion for summary judgment on this issue is DENIED; the Federal Defendants' summary judgment motion is GRANTED.

### D. Fisheries

■ Plaintiffs assert that the Federal Defendants' decision violates NFMA because the Federal Defendants did not demonstrate that the Project is consistent with the CNF and IPNF LRMP standards for protecting fisheries. The Federal Defendants respond that the LRMP standard has been superseded by the Inland Native Fish Strategy ("INFISH") and that the Project's consistency with INFISH standards has been demonstrated. Plaintiffs reply that INFISH augments but does not replace the LRMP fish standards and that compliance with the LRMP standards has not been demonstrated.

In mid 1995, the Forest Service adopted INFISH, which amended the CNF and IPNF LRMPs. (Ct. Rec. 7 Ex. 1. CNF ROD at 5, IPNF ROD at 9, FEIS at III–187, III–518, III–746.) INFISH sets forth standards and guidelines for Riparian Habitat Conservation Areas ("RHCAs"). RHCAs

> are portions of watersheds where riparian-dependent resources receive primary emphasis, and management activities are subject to specific standards and guidelines. [RHCAs] include traditional riparian corridors, wetlands, intermittent streams and other areas that help maintain the integrity of aquatic ecosystems by (1) influencing the delivery of coarse sediment, organic matter, and woody debris to streams, (2) providing root strength for channel stability, (3)

shading the stream, and (4) protecting water quality.

(Ct. Rec. 97 CD–ROM Disk 10, Inland Native Fish Strategy Environmental Assessment, Other*infs*INFS_DN_1995.pdf at A–4.) RHCA standards and guidelines replace existing conflicting direction in the LRMPs, except where the LRMPs provide more protection for inland native fish habitat. (Ct. Rec. 97 CD–ROM Disk 10, Inland Native Fish Strategy Environmental Assessment Decision Notice and Finding of No Significant Impact, Other*infs*INFS_DN_1995.pdf at 4.) RHCA standards and guidelines prohibit timber harvest in RHCA areas unless, *inter alia*, insect damages degrades riparian conditions or silvicultural practices are employed to acquire certain vegetation characteristics. (Ct. Rec. 97 CD–ROM Disk 10, Inland Native Fish Strategy Environmental Assessment Decision Notice and Finding of No Significant Impact, Other*infs*INFS_DN_1995.pdf at A–6—A–7 ¶ TM–1.) They also require road building to be minimized, and sediment delivery to streams from road surfaces to be avoided, in RHCAs (Ct. Rec. 97 CD–ROM Disk 10, Inland Native Fish Strategy Environmental Assessment Decision Notice and Finding of No Significant Impact, Other*infs*INFS_DN_1995.pdf at A–7 ¶ RF–2b, at A–8 ¶ RF–2d.)

The plain language of the INFISH documents and deference to the Forest Service's expertise in interpreting its LRMP, *Idaho Sporting Cong.*, 137 F.3d at 1154, lead the Court to conclude that INFISH supersedes the LRMPs in all areas where RHCA guidelines and standards apply,[8] at least for purposes of this Project where delivery of sediment to streams is the identified threat that proposed Project ac-

---

8. The INFISH RHCA standards and guidelines apply to all RHCAs and to activities in areas outside RHCAs that are identified as potentially degrading RHCAs. (Ct. Rec. 97 CD–ROM Disk 10, Inland Native Fish Strategy Environmental Assessment Decision Notice and Finding of No Significant Impact, Other*infs*INFS_DN_1995.pdf at A–6.)

tivities pose to fish habitat. The LRMP standards remain in all other areas.

Plaintiffs essentially complain that the FEIS does not demonstrate consistency with the LRMP standards where they apply. The LRMP standards require the maintenance of water quality parameters and uses. (Ct. Rec. 120 Ex. U at 4-44 ¶ 7; Ct. Rec. 97 CD–ROM Disk 10 Other*IPNF_1987_Forest_Plan.pdf at II–29 at E. Fish ¶ 1.) Since the Project is not expected to adversely affect beneficial uses at the watershed scale and generally not at the local tributary scale, (Ct. Rec. 7 Ex. 1 FEIS at III–150—III–174, III–476—III–503, III–725—III–739), it will maintain existing water quality. Accordingly, the Court finds that the FEIS demonstrates that the Project is consistent with the CNF and IPNF LRMP standards. Plaintiffs' motion for summary judgment on this issue is DENIED; the Federal Defendants' summary judgment motion is GRANTED.[9]

### E. Cumulative Impact Analysis under NEPA

■ Plaintiffs assert that the Federal Defendants' decision violated NEPA and was arbitrary and capricious because the FEIS fails to consider a variety of cumulative effects. Under NEPA, an EIS must consider the cumulative effects on the environment of the proposed project as well as past, present and reasonably foreseeable future projects, regardless of what agency (Federal or non-Federal) or person undertakes those projects. See Cuddy Mountain, 137 F.3d at 1378; Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800, 809–10 (9th Cir.1999); 40 C.F.R. §§ 1508.7, 1508.25(c) (1999). Activities

which are merely contemplated or hypothetical are not reasonably foreseeable and need not be considered. See Sierra Club v. Lujan, 949 F.2d 362, 368 (10th Cir.1991). The cumulative effects analysis must be sufficiently detailed to be " 'useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts,' " Muckleshoot, 177 F.3d at 809–10 (quoting City of Carmel–By–The Sea v. U.S. Dept. of Transp., 123 F.3d 1142, 1160 (9th Cir.1997)), and must rely on some quantified or detailed information. See Cuddy Mountain, 137 F.3d at 1379. "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." Id. at 1380.

■ NEPA regulations provide that if "incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement." 40 C.F.R. § 1502.22(a) (1999). An EIS must also " 'catalog adequately the relevant past projects in the area.' " Muckleshoot, 177 F.3d at 810 (quoting City of Carmel–By–The Sea, 123 F.3d at 1160). Past projects must be described with sufficient specificity to permit adequate review of their cumulative impact. See City of Carmel–By–The–Sea, 123 F.3d at 1160.

### 1. Effects of Old Growth Harvest on Old Growth Species

Plaintiffs assert that the FEIS does not consider the cumulative impacts of old

9. Plaintiffs also assert that Project implementation has violated INFISH and therefore NFMA. (Renewed Mot. & Mem. Supp. T.R.O., Ct. Rec. 62, at 14–15.) Specifically, Plaintiffs claim that logging has occurred within an INFISH riparian buffer zone in unit 40 of the Windy Butte Timber Sale. This claim is outside of the scope of this suit because it concerns Project implementation, rather than the decision to proceed with and implement the Project. Accordingly, the Court declines to rule on it.

growth harvest on old-growth dependent species because the cumulative effects analysis is based on flawed TSMRS data. (Ct. Rec. 4 at 21 ll. 13–22.) However, the Court has found that the FEIS presents and the Federal Defendants relied on high quality old growth forest data, see III.B.1. above, "NEPA Requirements for Meaningful Old Growth Data." Accordingly, the Federal Defendants' summary judgment motion is GRANTED with respect to this issue; Plaintiffs' motion is DENIED.

### 2. Effects on CNF from Timber Harvest on Adjacent Lands

 Plaintiffs claim that the FEIS fails to adequately consider cumulative impacts on the CNF by failing to account for past, ongoing and foreseeable timber harvest activity on adjacent private and federal lands in the Project area. Specifically, Plaintiffs assert that the FEIS (a) fails to list past timber harvest activities that occurred on adjacent federal and non-federal lands that would contribute to the cumulative impacts of the Project, (Ct. Rec. 104 at 26 ll. 5–9), and (b) fails to even look at information concerning other projects, stating either that cumulative effects analysis incorporating non-federal lands would be too difficult or that the impacts of actions on non-federal lands will be inconsequential, (Ct. Rec. 104 at 25–26).

#### a. Cataloging of Past Timber Harvest Activities

The Vegetation, Wildlife, Watershed, Fisheries and Fuels/Fires sections of the FEIS reference past actions generally, with the Vegetation and Wildlife sections referencing Appendix E as listing certain of the actions taken into account in describing current conditions. (Ct. Rec. 7 Ex. 1 FEIS at III–728, III–730, III–735,

III–757, III–758, III–759, III–760, III–761, III–762, III–763, III–676, III–779, III–787.) Appendix E lists "Reasonably Foreseeable and Ongoing Projects on the Newport Ranger District," (Ct. Rec. 7 Ex. 1 FEIS at E–9—E–10), that occur or may occur within the boundaries of the cumulative effects analysis area,[10] (Ct. Rec. 7 Ex. 1 FEIS at E–9). Excluded from the list are routine activities such as road and powerline maintenance activities. (Ct. Rec. 7 Ex. 1 FEIS at E–9.)

No past projects are cataloged in Appendix E or specifically mentioned elsewhere in the FEIS. Although the FEIS incorporates the effects of past projects as part of the "current condition," the Court finds that the failure to identify these projects prevents the decisionmaker from knowing what projects have been included and therefore from making an informed decision. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (NEPA ensures that the agency, in reaching its decision, will have available and will carefully consider detailed information concerning significant environmental impacts). Accordingly, the Federal Defendants violated NEPA in approving and proceeding with the Project. Plaintiffs' motion for summary judgment on the issue of inadequate project cataloging is GRANTED; the Federal Defendants' motion is DENIED.

#### b. Consideration of Adjacent Land Timber Harvest Activities

 Plaintiffs assert that the FEIS states that the cumulative effects analysis incorporating non-federal lands would be too difficult and that the impacts of actions on non-federal lands will be inconsequen-

---

**10.** The cumulative effects analysis area appears to be the same as the Newport Analysis Area, an area of about 59,200 acres of which about 52% is National Forest System Lands. (Ct. Rec. 7 Ex. 1 FEIS at III–661.)

tial, (Ct. Rec. 104 at 25 11. 18–23). The FEIS does not state that cumulative effects analysis incorporating non-federal lands would be too difficult. Rather the FEIS page cited by Plaintiffs states that "[t]he effects of Douglas-fir beetle mortality on other ownerships within the analysis area are difficult to ascertain due to a lack of detailed information on current conditions and on how private land owners will treat beetle-killed trees." (Ct. Rec. 7 Ex. 1 FEIS at III–676.) Additionally, the FEIS pages allegedly stating that effects from activities on adjacent lands are inconsequential in fact discuss only cumulative effects of the project alternatives. They do not discuss cumulative effects with respect to other activities. (Ct. Rec. 7 Ex. 1 FEIS at III–691, III–757.) Accordingly, the Court considers only Plaintiffs' general claim that the FEIS fails to adequately consider the effects of past, ongoing or foreseeable timber harvest activities occurring on adjacent lands in the Project area.[11]

The effects of non-Project activities are discussed throughout the FEIS. At the outset, the FEIS Introduction states that the effects analysis set forth in the ensuing sections "considered other activities that are either reasonably foreseeable or are actually ongoing at this time. These activities are identified in Appendix E—Reasonably Foreseeable Activities." (Ct. Rec. 7 Ex. 1 FEIS at III–663.)

Nowhere in the cumulative effects discussions is the reader clearly directed to quantified or detailed information, contained either in the FEIS or the adminis-

trative record, that supports the discussions and their conclusions with respect to activity on adjacent lands. No information is provided that specifically concerns past projects. Information concerning individual ongoing and reasonably foreseeable projects is scant, being limited to that provided in Appendix E. The projects listed in Appendix E consist of three foreseeable timber sale projects on lands administered by the Forest Service, one foreseeable timber sale project on industrial private forest lands and state lands, two active timber sale projects, and a Douglas fir Beetle Pheromone Study. (Ct. Rec. 7 Ex. 1 FEIS at E–9—E–10.) The information provided for the projects comprises the project name, a brief qualitative description of the project activities, the affected watershed and a few notes regarding the status of the NEPA process and project implementation dates. (Ct. Rec. 7 Ex. 1 FEIS at E–9.) With one exception, no information is provided on the actual size of the projects, whether in acreage, board-feet or miles. Accordingly, the Court finds that the cumulative effects discussions are deficient with respect to consideration of activity on adjacent lands. The Federal Defendants' decision to approve and proceed with the Project was therefore arbitrary and capricious. *See Cuddy Mountain*, 137 F.3d at 1379 (requiring quantified or detailed information in cumulative effects analysis.)

The Federal Defendants assert that if a project, when considered in conjunction with other activities, results in no cumula-

11. In their summary judgment memorandum, Plaintiffs assert that the FEIS did not consider twelve Forest Practice Applications for logging private land. The applications were approved by the summer of 1999. (Ct. Rec. 104 at 25 11. 3–10.) In their reply brief, Plaintiffs acknowledge that the FEIS was in production during the spring of 1999, (Ct. Rec. 146 at 2 1. 20), the time when the notices of the log-

ging activity were submitted. Recognizing that there is a cut-off point when analysis of new information must cease, Plaintiffs then discuss only projects that were ongoing in 1998. (Ct. Rec. 146 at 2–3.) Because Plaintiffs appear to have discarded any claims regarding the FEIS' treatment of the twelve applications, the Court does not consider them.

tive negative environmental impacts, the cumulative effects analysis need not contain detailed information on future actions. *See Mississippi River Basin Alliance v. Westphal,* 230 F.3d 170, 176 (5th Cir.2000). In *Westphal,* the court found sufficient a cumulative impact analysis that discussed various proposed projects in a general fashion and concluded that the proposed action, when added to the former, present and foreseeable actions resulted in a net gain in habitat and environmental values. However, the agency in *Westphal* not only considered the proposed projects but also "made the information available to a larger audience." *Westphal,* 230 F.3d at 175–76. Here, the Forest Service has not made available the information concerning other actions. The Vegetation and Wildlife sections note that the reasonably foreseeable actions involve harvest and burning of 3,000 acres plus a small amount of road construction and reconstruction. (Ct. Rec. 7 Ex. 1 FEIS at III–787; III–788, III–791, III–792.) This information is insufficient to demonstrate that a useful analysis of the cumulative impacts of past, present and future projects was undertaken.

Plaintiffs' motion for summary judgment on this issue is GRANTED; the Federal Defendants' motion is DENIED.

### 3. Effects on IPNF from Logging

Plaintiffs assert that the cumulative effects analysis for the Coeur d'Alene Ranger District portion of the IPNF Project is deficient because the FEIS neither discloses nor analyzes ongoing and future cumulative effects of private logging. Plaintiffs also assert the analysis for the Priest Lake Ranger District portion of the IPNF Project is deficient because (1) it relies on the cumulative effects section of the Lakeface–Lamb project EIS, a section the Forest Service found to be inadequate, (2) it neither discloses nor analyzes the effects of the Simpson Timber Sale, and (3) it discloses no cumulative effects analysis

of future private and Forest Service projects.

#### a. Coeur d'Alene Ranger District

The FEIS, at least to some extent, considers the effects of ongoing and future private logging. Appendix E includes ongoing or reasonably foreseeable activities, it does not include "routine activities such as preferred fuelwood areas, road maintenance, and special use permits." (Ct. Rec. 7 Ex. 1 FEIS at E–1.) The listed project categories include reasonably foreseeable projects and foreseeable timber sale projects on industrial private forest lands and Bureau of Land Management. (Ct. Rec. 7 Ex. 1 FEIS at E–1—E–4.) Two Bureau of Land Management timber sale projects are listed which involve salvage timber harvesting. One involves light salvage harvesting by helicopter on 15 acres. The other involves 63 acres of helicopter logging and 10 acres of tractor logging. This latter project also calls for 400 feet of new road, 0.5 acres of landing, 1.8 miles of road renovation, 0.3 miles of road reclamation and 24 acres of weed management. (Ct. Rec. 7 Ex. 1 FEIS at E–4.) The appendix lists the approximate acreage and logging method for the sales. The Court finds that the disclosure and analysis of the cumulative effects of these two sales does not have the same flaws as the cumulative effect analysis for the CNF portion of the Project. The information included in the description of the projects, though brief, provides a basis for the discussions and conclusions in the FEIS.

The analysis of future activity on non-industrial private land, however, is flawed. If "incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency

shall include the information in the environmental impact statement." 40 C.F.R. § 1502.22(a) (1999). If such information cannot be obtained because of its cost or because the means to obtain it are not known, the FEIS must (1) state that the information is incomplete, (2) explain how the information is relevant to evaluating reasonably foreseeable significant adverse impacts, (3) summarize existing credible scientific evidence relevant to evaluating the reasonably foreseeable significant adverse impacts, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. *See* 40 C.F.R. § 1502.22(b) (1999).

The Forest Service, at the time it was developing the FEIS, could not have reasonably determined what non-industrial timber harvesting activities would be pursued by private landowners in the analysis area. Accordingly, the FEIS's statement in the Vegetation section, which indicates that the information is missing, states how the landowners will likely act, and identifies the resulting effect on tree species, is appropriate. However, there is almost no discussion of private timber harvest effects on habitat or wildlife, ostensibly because the private land provides no habitat. (Ct. Rec. 7 Ex. 1 FEIS at III–262.) Because no basis for this assertion is set forth, the FEIS fails to include a useful analysis of the cumulative impacts of future private timber harvest projects.

The focus of Plaintiffs' complaint regarding ongoing activity on non-industrial private land appears to be that the FEIS does not disclose past logging activity. Specifically, Plaintiffs note that during 1998 some 98,000,000 board feet of timber were logged from private land in Kootenai County that encompasses the Coeur d'Alene Ranger District Project analysis area; apparently, the logging was done pursuant to 196 Forest Practices notices. (Ct. Rec.

104 at 27 11. 8–17.) As is discussed above, an EIS must adequately catalog and consider the cumulative impacts of past projects. *See Muckleshoot*, 177 F.3d at 810; 40 C.F.R. §§ 1508.7, 1508.25(c). The FEIS' failure to even list the 1998 projects renders the cumulative effects analysis inadequate.

Accordingly, the Federal Defendants decision to approve and proceed with the Project was arbitrary and capricious because the Coeur d'Alene Ranger District portion of the FEIS fails to include a useful analysis of the cumulative impacts on habitat or wildlife of future non-industrial private timber harvest projects. The decision violated NEPA because the FEIS fails to catalog the private logging projects that occurred in 1998. Plaintiffs' motion for summary judgment on these issues is GRANTED; the Federal Defendants' motion is DENIED.

### b. Priest Lake Ranger District

### i. Lakeface–Lamb Project EIS

The Lakeface–Lamb Project is a foreseeable fuels reduction project in the Priest Lake Ranger District Project analysis area that has been evaluated independently and in relation to the proposed Project. (Ct. Rec. 7 Ex. 1 FEIS at III–482.) It is listed in Exhibit E as a reasonably foreseeable and ongoing project. (Ct. Rec. 7 Ex. 1 FEIS at E–5.) The FEIS concludes that the Lakeface–Lamb Project "would not contribute any measurable effects, by itself or cumulatively, under any alternative in terms of water quality or water resource values." (Ct. Rec. 7 Ex. 1 FEIS at III–482.) Based on this statement, Plaintiffs conclude that the FEIS is inadequate because it relies on the cumulative analysis in the Lakeface–Lamb EIS, an analysis that the Forest Service found to be inadequate, (Second Decl. Ronald D. Mitchell, Ct. Rec. 63, Ex. 7). Plaintiffs

have presented no information to support their claim that the FEIS in fact relies on any flawed analysis contained in the Lakeface–Lamb EIS. Accordingly, the Court DENIES Plaintiffs' summary judgment motion on this issue.

### ii. Stimson Timber Sale

 Plaintiffs assert that the 106–acre Simpson Timber Sale was neither disclosed nor analyzed in the FEIS' cumulative effects analysis. (Ct. Rec. 104 at 27 ll. 3–5.) It ·appears that Plaintiffs are referring to the 106 acre parcel belonging to Stimson Lumber that drains into the Lamb Creek and Kalispell Creek drainages. (Ct. Rec. 63 Ex. 4.) Although this sale and potential logging project is referenced in the Lakeface Lamb EIS, (Ct. Rec. 63 Ex. 4), Appendix E does not list it as a reasonably foreseeable or ongoing logging project. The Court finds that the Federal Defendants' decision to approve and implement the Project violates NEPA because the FEIS fails to even list the Stimson lumber sale. *See Muckleshoot,* 177 F.3d at 810. Plaintiffs' summary judgment motion on this issue is GRANTED; the Federal Defendants' summary judgment motion is DENIED.

### iii. Analysis of Future Projects

Plaintiffs assert that while the FEIS lists some future private and Forest Service projects for the Priest Lake District Project analysis area, it discloses no cumulative effects analysis of those projects.

The projects to which Plaintiffs refer are essentially those listed in Appendix E of the FEIS. (Ct. Rec. 104 at 27 ll. 6–8, referencing Ct. Rec. 7 Ex. 2 CD ROM # 2 Watershed/Analysis/General–Information/P_WA_200.pdf.) The effects of these projects are in fact discussed throughout the Priest Lake Ranger District portion of the FEIS. As the IPNF portion of the FEIS notes at the outset, the effects analysis "considered other activities ... that

are either reasonably foreseeable or are actually ongoing at this time. These project activities are identified in Appendix E—Reasonably Foreseeable Activities." (Ct. Rec. 7 Ex. 1 FEIS at III–5.)

However, as for the CNF, the cumulative effects discussion is inadequate because it fails to set forth or reference quantified or detailed information supporting the analysis. While the acreage of a foreseeable project is set forth in one discussion, (Ct. Rec. 7 Ex. 1 FEIS at III–399), the remaining discussions refer the reader to Appendix E. Appendix E lists foreseeable timber sale projects on industrial private forest lands, state lands and Forest Service lands. The harvest acreage, together with road construction miles and information on the percent to be harvested, are provided for all but one of the private and state lands projects. This information provides a basis for the discussions and conclusions in the FEIS.

Road construction miles are listed for the Forest Service sales; however, no information on the harvest acreage or percent is provided. Four of the seven sales are described as "small sales." This information provides an insufficient basis for the FEIS conclusions. Accordingly, the Court finds that the cumulative effects discussions are deficient with respect to consideration of timber sale projects on Forest Service lands. The Federal Defendants' decision to approve and proceed with the Project was therefore arbitrary and capricious. *See Cuddy Mountain,* 137 F.3d at 1379. Plaintiffs' motion for summary judgment on this issue is GRANTED; the Federal Defendants' motion is DENIED.

### 4. Effects of Water Yield and Sediment Discharge

Plaintiffs assert that the cumulative effects of water yield and sediment dis-

charged to streams, and therefore the effects on MIS, are underestimated because they are based on flawed information and misuse of WATSED. Specifically, Plaintiffs assert that (1) the information input into WATSED is flawed because it is based on the assumption that mostly dead and dying trees will be logged and (2) WATSED was misused. The Court found, however, that Plaintiffs have not borne their burden of proving that when the Federal Defendants made their decision they falsely assumed that more green timber would be harvested under the Project than timber that was dead, dying or expected to die; see III.C.5.a. above. The Court also concluded that the Forest Service's use of WATSED was not improper; see III.C.5.d. above. Accordingly, Plaintiffs' summary judgment motion with respect to this issue is DENIED; the Federal Defendants' motion is GRANTED.

### 5. Effects of Grazing in the IPNF Project Area

Plaintiffs assert that the FEIS fails to consider the cumulative effects of grazing on the IPNF Project analysis area. Specifically, Plaintiffs claim that the FEIS fails to show how grazing is factored into the cumulative effects analysis for soils, water quality or impacts to fish. Plaintiffs also note that the FEIS fails to consider that the reseeding incident to the Project's road closures will draw cattle, rather than keep them away.

Plaintiffs state that the FEIS discloses that the effects of grazing is a serious problem in the Project area, with grazing having destablized streambanks in certain areas. (Ct. Rec. 104 at 28–29.) However, Plaintiffs do not dispute the Federal Defendants' assertion that an extensive discussion of cattle grazing is unnecessary because grazing was not identified as a significant issue with respect to the Project. *See* 40 C.F.R. § 1502.2(b) (1999) (impacts shall be discussed in proportion to

their significance). Very little grazing occurs within the IPNF Project area and none occurs in the CNF Project area. (Ct. Rec. 121 at 18 11. 2–3.) No grazing will be instituted as part of the Project. The FEIS considered the effects of grazing activities by incorporating them in the existing condition of the IPNF Project analysis area. Those ongoing grazing activities listed in Appendix E of the FEIS were also incorporated into the existing condition. (Ct. Rec. 7 Ex. 1 FEIS at III–5, E–1 tbl. E–3, E–9 tbl. E–14.) The Court finds that it is sufficient that existing grazing effects and anticipated effects of those ongoing grazing projects listed in Appendix E were incorporated in some fashion in the IPNF Project analysis area's existing condition. Plaintiffs cite no authority for their assertion that the FEIS must show how grazing was factored into the baseline.

The Project will remove 7.5 miles of roads that currently encroach on streams. The Federal Defendants assert that this will reduce the effect those roads have of funneling cattle to stream banks. Plaintiffs claim that the grass reseeding that is incident to road removal will in fact draw cattle to the closed roads and therefore to the stream banks. Because this is a conflict between experts and their reasonable evaluations of Project effects, the Court defers to the Federal Defendants' assessment of the Project's impacts. *See Marsh*, 490 U.S. at 378, 109 S.Ct. 1851.

Plaintiffs' summary judgment motion with respect to this issue is DENIED; the Federal Defendants' motion is GRANTED.

### 6. Effects of Off Road Vehicles

■ In their First Amended Complaint, (Ct.Rec.174), and their response to the Federal Defendants' summary judgment motion, (Ct.Rec.135), Plaintiffs assert that FEIS fails to adequately consider,

analyze and disclose the cumulative impacts of off road vehicle ("ORV") use on the roads in the CNF and IPNF Project areas. The Federal Defendants asserts that impacts either to or from ORVs were not raised as a significant issue during the FEIS scoping and public involvement process and that Plaintiffs cannot now raise the issue. *Havasupai Tribe v. Robertson,* 943 F.2d 32, 34 (9th Cir.1991) (finding that, absent exceptional circumstances, a "significant issue" that was raised after a final EIS was issued but not raised during the comment process may not form a basis for reversing the agency decision).

Plaintiffs state that they raised the ORV issue in Plaintiff Lands Council's two December 16, 1998, scoping letters. These letters apparently incorporate Land Council's April 14, 1998, letter to the IPNF—a letter which "on page 8 clearly raises the issue." (Ct. Rec. 135 at 9 11. 9–13.) Plaintiffs also state that the issue was rased on pages 20, 23, 40 and 50 of Land Council's DEIS comments. (Ct. Rec. 135 at 9 11. 13–14.) Plaintiffs do not direct the Court to, and the Court could not find, any portion of record before the Court that contains copies of these letters or comments. However, a comment on the Project's Draft EIS ("DEIS") that the Federal Defendants attribute to Plaintiffs, (Ct. Rec. 121 at 19 11. 22–26), mentions ORVs:

> The DEIS says "Security design features are likely to provide more than adequate protection from mortality risk factors, because wolverines are likely to be transients in the portions of the Priest Sub–Basin that the proposed action areas occur in" (III–416). Yet in other places, the ineffectiveness of road closures' keeping out ORV users is mentioned. This also ignores the fact that even closed roads provide much easier access for hunters, trappers, and—important for wolverines and other species such as pine marten, fisher and lynx—snowmobiles.

> Logging roads contribute to poaching by providing easy access for poachers.

(Ct. Rec. 7 Ex. 1 FEIS A–166.) The Court finds that this comment highlights an internal inconsistency in the DEIS and is insufficient to raise the issue of cumulative impacts of ORVs. Accordingly, the Federal Defendants' motion for summary judgment with respect to this issue is GRANTED.

**F. Summary**

Summary judgment is GRANTED for Plaintiffs as follows:

1. With respect to Old Growth Habitat, Old Growth Species and Sensitive Species, the Federal Defendants' decision violates NFMA by failing to demonstrate consistency with the CNF and IPNF old growth standards, see III.B.2. above.

2. With respect to Water Quality, the Federal Defendants' decision violates NEPA because the FEIS fails to disclose

 a. that WATSED does not incorporate the effects of rain-on-snow events in its peak flow analysis . and that WATSED does not evaluate in-channel and stream-bank erosion, see III.C.5.c. above.

 b. WATSED's predictions for sediment yield and peak flow for the first six years of the Project, see III.C.5.e. above.

3. With respect to Cumulative Impact Analysis for the CNF portion of the Project, the Federal Defendants' decision violates NEPA and is arbitrary and capricious because the FEIS fails to

 a. catalog the past timber harvest activities taken into account in describing current conditions, see III.E.2.a. above.

 b. adequately consider the effects of past, ongoing or foreseeable timber harvest activities occurring on adjacent

lands in the Project area, see III.E.2.b. above.

4. With respect to Cumulative Impact Analysis for the Coeur d'Alene Ranger District portion of the Project, the Federal Defendants' decision is arbitrary and capricious and violates NEPA because the FEIS fails to (1) include a useful analysis of the cumulative impacts on habitat or wildlife of future non-industrial private timber harvest projects, and (2) catalog the private logging projects that occurred in 1998, see III.E.3.a. above.

5. With respect to Cumulative Impact Analysis for the Priest Lake Ranger District portion of the Project, the Federal Defendants' decision violates NEPA and is arbitrary and capricious because the FEIS fails to (1) catalog the Stimson lumber sale, and (2) adequately consider the effects of foreseeable timber harvest activities on Forest Service lands, see III.E.3.b.ii. and iii. above.

Summary judgment is GRANTED for the Federal Defendants as follows:

1. With respect to Old Growth Habitat, Old Growth Species and Sensitive Species, the Federal Defendants' decision

a. does not violate NEPA and is not arbitrary and capricious because the FEIS did not fail to present high quality old growth forest data for the CNF or for the IPNF, see III.B.1.a. and b. above.

b. neither violates NFMA nor is arbitrary and capricious because the FEIS relies on habitat monitoring and analysis, rather than on species population monitoring, see III.B.4. above.

2. With respect to Water Quality, the Federal Defendants' decision

a. does not violate the CWA because the Project (1) is not anticipated to cause negative effects to beneficial uses as a result temporarily increased sediment, and (2) does not improperly use

state-approved BMPs to mitigate sediment loading effects, see III.C.1.a.i. and ii. above.

b. is not arbitrary and capricious because the Project reasonably (1) relies on Project BMPs and (2) adopts the water quality monitoring plan set forth in the FEIS, see III.C.1.b. above.

c. does not violate NFMA because the water quality monitoring plan for the IPNF Project areas is consistent with the IPNF LRMP water quality monitoring program, see III.C.2. above.

d. is not arbitrary and capricious because the IPNF LRMP annual validation and recalibration requirement does not apply to WATSED, see III.C.4. above.

e. Is not arbitrary and capricious and does not violate NEPA because

i. the FEIS does not underestimate the Project's impacts to water yield and sediment by assuming that most of the trees that harvested are ones that were dead, dying or expected to die, see III.C.5.a. above.

ii. the FEIS need not have disclosed WATSED's validation or recalibration status with respect to the IPNF LRMP validation and recalibration requirement, see III.C.5.b. above.

iii. the FEIS did not improperly use the WATSED model, see III.C.5.d., above.

iv. the FEIS need not have disclosed impacts from rain-on-snow events or from instream and streambank sediment discharges, and the IPNF Forest Service lacked guidelines for analyzing potential adverse impacts from rain-on-snow events, see III.C.5.f.i. and ii. above.

3. With respect to Fisheries, the Federal Defendants' decision does not violate NFMA because the FEIS demonstrates that the Project is consistent with CNF

and IPNF LRMP standards, see III.D. above.

4. With respect to Cumulative Impact Analysis, the Federal Defendants' decision does not violate NEPA because

 a. the cumulative effects analysis of old growth harvest is not based on flawed TSMRS data, see III.E.1. above.

 b. the cumulative effects of water yield and sediment discharged to streams is not based on flawed information or misuse of WATSED, see III.E.4. above.

 c. the cumulative effects of grazing in the IPNF Project analysis area were sufficiently considered, see III.E.5. above.

 d. the cumulative effects of off road vehicles need not have been considered because off road vehicles were not raised as a significant issue during the public comment process, see III.E.6. above.

Summary judgment is DENIED for all remaining issues considered in this Order. However, as the Plaintiffs have prevailed on a number of issues, which are sufficient to support a permanent injunction, *see infra* IV, it is unnecessary to have further proceedings on the issues for which summary judgment has been denied.

## IV. PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION

Plaintiffs seek to permanently enjoin the implementation of the Project until the Federal Defendants comply with all applicable laws. Because Plaintiffs have prevailed on summary judgment on at least one of their claims, the Court now determines if a permanent injunction is warranted.

"The basis for injunctive relief is irreparable injury and inadequacy of legal remedies. This requires a court to balance the competing claims of injury and the effect on each party of granting or withholding of the requested relief." *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir.1988). A court should also consider the public interest when determining whether to award an injunction. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 121 S.Ct. 1711, 1720, 149 L.Ed.2d 722 (2001); *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Although an injunction is an equitable remedy the issuance of which is within the court's discretion, *see Amoco Production Co.*, 480 U.S. at 542, 107 S.Ct. 1396, Ninth Circuit cases "repeatedly have held that, absent 'unusual circumstances,' an injunction is the appropriate remedy for a violation of NEPA's procedural requirements." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir.1985). Such an "unusual circumstance" exists where an injunction itself would cause irreparable harm. *See id.* at n. 8.

Here, the Plaintiffs have properly invoked the presumption that a permanent injunction should flow from the Court's finding that the Defendants have violated NEPA's procedural requirements. (Ct. Rec. 104 at 3.) Current Ninth Circuit authority only recognizes one exception to the usual rule: when the grant of injunctive relief would cause irreparable harm. *Thomas*, 753 F.2d at 764 n. 8.

The Defendants have not identified how issuance of a permanent injunction would cause irreparable harm. Rather, in opposition, the Defendants cite *Alpine Lakes Prot. Soc'y v. Schlapfer*, 518 F.2d 1089, 1090 (9th Cir.1975). However, such a citation, without more is insufficient to avoid a permanent injunction. On its facts, *Alpine Lakes* is distinguishable. There, the Plaintiffs sought an injunction pending appeal, a request for temporary relief. The *Alpine Lakes* court did not address the propriety of a permanent injunction. While denial of

the former eliminates injunctive relief during the appeal, denial of the latter eliminates injunctive relief altogether.

To eliminate injunctive relief totally might render this Court's order an advisory opinion. While the Defendants seem to recognize the problem, they count it as a benefit. "Thus, even if plaintiffs prevail on the merits, the court should enter a declaratory judgment but deny injunctive relief. Such an outcome would put the agency on notice of the matters that need correcting in future projects while still allowing the public benefits to be realized." (Ct. Rec. 121 at 50.) While the issue of justiciability is not properly before the Court, the Defendants argue for an order declaring they have violated NEPA while refusing to provide any meaningful relief to the injury suffered. The Court declines such an invitation. Having found that the Defendants have not established the *Thomas* exception, nor cited a case in which the Ninth Circuit has refused to enjoin a violation of NEPA's procedural requirements, the Court must issue a permanent injunction.

**IT IS HEREBY ORDERED:**

1. Plaintiffs' Motion for Summary Judgment, (**Ct.Rec.103–1**), and the Federal Defendants' Motion for Summary Judgment, (**Ct.Rec.109**), are **GRANTED in part** and **DENIED in part** as set forth herein.

2. Plaintiffs' Motion for Permanent Injunction, (**Ct.Rec.103–2**), is **GRANTED**.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and provide copies to counsel.